UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | CR-06-80-B-W |
| | ) | |
| MARK McCURDY, | ) | |
| | ) | |
| Defendant. | ) | |

### ORDER ON MOTION TO SUPPRESS

Relying on the consent of Mark McCurdy's girlfriend, Deputy Jonathan Rolfe searched the Defendant's residence, and in his attic discovered a gun case and rucksack containing firearms and ammunition, which form the basis of the pending criminal charges. Mr. McCurdy challenges the legality of the search at his home, claiming that his girlfriend lacked authority to consent to a search and, in any event, she did not actually consent. In addition, Mr. McCurdy contends that he had a reasonable expectation of privacy in the gun case, which the police violated when they later conducted a warrantless search of the case at the sheriff's department. Concluding that the searches, both at the home and at the department, pass constitutional muster, the Court denies Defendant's motion to suppress.

### I.   PROCEDURAL HISTORY

On November 15, 2006, a federal grand jury indicted Mark McCurdy for unlawful possession of a firearm by a felon under 18 U.S.C. § 922(g). *See Indictment* (Docket # 1). On December 26, 2006, the Defendant moved to suppress the firearm that forms the basis for the charge, claiming it was the fruit of an unlawful search. *See Def.'s Mot. to Suppress* (Docket # 11). The Court held a suppression hearing on February 8, 2007 and February 16, 2007 and following the hearing, the parties filed briefs. *See Gov't Closing Argument on the Def.'s*

*Mot. to Suppress* (Docket # 28) (*Gov't Mem.*); *Def.'s Further Mem. in Supp. of Mot. to Suppress* (Docket # 29) (*Def.'s Mem.*).

## II.   FACTUAL BACKGROUND[1]

### A.   An Early Morning Call to the Police

In the early morning of March 27, 2006, Deputy Jonathan Rolfe of the Washington County Sheriff's Department responded to a reported domestic assault at the Defendant's residence at 17 Hopkins Lane, Whiting, Maine. Defendant's girlfriend, Paula Sawtelle, alleged that, as she was leaving the yard at about 5:30 a.m. to purchase a newspaper, Mr. McCurdy assaulted her. According to Ms. Sawtelle, her adult son, Stephen (Jon) Cheney, intervened and a scuffle ensued between the two men. The Defendant, having sustained some minor injuries, left in his vehicle. Ms. Sawtelle returned to the house to get her cordless telephone, and asked her son to call the police. The police were informed not only that there had been a domestic assault, but also that Mr. McCurdy had a knife and access to firearms inside the residence.

### B.   The En Route Interview with Mark McCurdy

Deputy Rolfe was dispatched to the scene. En route, he learned that Officer Alan Curtis had stopped Mr. McCurdy in Machias, a nearby town, and Deputy Rolfe, therefore, went directly to Machias to speak with Mr. McCurdy. When he arrived, he found Mr. McCurdy sitting in his truck and he questioned him. Mr. McCurdy denied that he had assaulted his girlfriend. Deputy Rolfe noticed a large bump on Mr. McCurdy's forehead; he asked him whether he wanted medical treatment and Mr. McCurdy responded that he did. Officer Curtis had found drug paraphernalia in the McCurdy truck and he had also confirmed that Mr. McCurdy was operating his vehicle after his driver's license had been suspended. Officer Curtis placed Mr. McCurdy under arrest for possession of drug paraphernalia and operating after suspension, but agreed to

---

[1] The facts are gleaned from testimony and exhibits at the suppression hearing.

first take Mr. McCurdy to the hospital. Before they left, Deputy Rolfe made it clear to Mr. McCurdy that he was going to continue to Mr. McCurdy's residence to complete his investigation.

### C. The Interview of Paula Sawtelle

When Deputy Rolfe arrived at the McCurdy residence, he met Ms. Sawtelle, who allowed him to enter the residence. Once inside, he discussed the incident with both Ms. Sawtelle and Mr. Cheney. The McCurdy residence is a small two-story home. The downstairs consists of a living room, which is accessed directly from the outside door, a kitchen, and a bedroom. The second story is an unfinished attic accessed by a fold-down staircase located in the living room. To fold the staircase down, some living room furniture has to be moved.

Ms. Sawtelle told Deputy Rolfe that she had been going to get the newspaper when Mr. McCurdy followed her outside. As she began to get into her truck, Mr. McCurdy announced that she was not going to take the truck and he grabbed her by her hooded sweatshirt and pulled her out of the vehicle onto the ground. Ms. Sawtelle complained of injuries to her knee and Deputy Rolfe observed red marks around her neck. Ms. Sawtelle went on to explain that as Mr. McCurdy was assaulting her, Mr. Cheney came running out of the house and intervened. As he was fighting with Mr. McCurdy, Mr. Cheney said that he saw a knife in Mr. McCurdy's hand and he managed to grab it away from him. Mr. Cheney threw the knife in a field, where Deputy Rolfe later recovered it.

Ms. Sawtelle told him that she had been living with Mr. McCurdy for the past six years, but that she was going to pack up her belongings and stay with her son for the time being.[2]

---

[2] In her witness statement, she listed her address as "17 Hopkins, Whiting." Gov't Ex. 2. The police report, prepared by Deputy Rolfe, however, listed her address as "1 North St., Machias, ME," which is her son's address. Gov't Ex. 1. Deputy Rolfe explained that he listed the North Street address in the police report because this is where Ms. Sawtelle was going to be, a fact important for police follow-up and victim assistance.

While completing witness statement forms, she and her son informed Deputy Rolfe that the Defendant was a felon and had a firearm in the house. When Mr. Cheney reported that the firearm was in the attic, Ms. Sawtelle nodded. Deputy Rolfe decided to remove the firearm from the McCurdy residence.

        **D.**     **The Search of the McCurdy Attic: the Ammunition, the Gun Case, the Assault Rifle, and the Grenade Launcher**

Mr. Cheney pulled the staircase down and proceeded into the attic and Deputy Rolfe followed him upstairs. The attic was small, cluttered, and unimproved with possessions scattered throughout. There was no evidence anyone was living there; it was apparently used only for storage. Mr. Cheney walked over to a black rucksack similar to a duffel bag. He picked it up and handed it to Deputy Rolfe. The Deputy observed a 40 mm flare round in one of the exterior pouches and he then opened the rucksack, finding several loaded magazines inside.

Mr. Cheney pointed to a plastic case. Although nothing about the case necessarily established it was for a firearm, Deputy Rolfe thought it was a gun case, based on prior experience. The case was locked and he did not attempt to open it; rather, he took possession of it and brought it to the sheriff's department. After Mr. McCurdy denied that it was his gun case, Deputy Rolfe and Lieutenant David Denbow opened it at the department and found a Colt AR-15 .223 rifle, a M203 gas grenade launcher, and an upper .223 caliber rifle assembly. There were also two loaded magazines in the case.

        **E.**     **Paula Sawtelle and Mark McCurdy's Residence**

There is conflicting evidence about Ms. Sawtelle's connection with the McCurdy residence at the time of the search. The Government asserts that she was not only living in the McCurdy residence, but had common authority over it. Mr. McCurdy says she was a mere house guest and had no authority to consent to a search of the residence, much less the attic. The

evidence establishes that Ms. Sawtelle had no legal interest in the residence; she was neither an owner nor lessee. In fact, she testified that she always felt like a guest in his house. When the police asked her, after the incident, whether she wanted Mr. McCurdy restrained from the home, she responded that it was his house and she would leave. Ms. Sawtelle had been dating Mr. McCurdy since the late 1990s, and since 2002-03, she had been living with him "off and on." During the summer, she tended to stay at his house in Whiting and during the winter, he stayed at her home in nearby Lubec. Ms. Sawtelle testified that Mr. McCurdy's job took him away from the Whiting home for months at a time.

She also spent a fair amount of time away from the McCurdy residence. Beginning August 2004, she moved to Vermont and worked there until December 2004. In December 2004, she moved to Atlanta, where she stayed until May 2005. From May to December 2005, she returned to Maine, but lived at a residence in Eastport. In December 2005, she went to Massachusetts, where she visited family. After the holidays, she returned to Maine and spent about one month with Mr. McCurdy. In February 2006, she briefly visited Florida. After she returned to Maine, she moved back into Mr. McCurdy's residence on March 18, 2006, where she shared a bedroom with him.[3]

As of March 27, 2006, Ms. Sawtelle was sleeping and taking her meals at Mr. McCurdy's house, stored her clothes there, and had a key to the house. She brought her fifteen-year-old daughter to his home and she was living there as well. Both Ms. Sawtelle and her daughter had stored personal items throughout the attic. During the week before the incident, Ms. Sawtelle's son, Stephen Cheney, and his one-year-old daughter had been staying in the McCurdy house as guests.

---

[3] Ms. Sawtelle's whereabouts at various times is confusing. For purposes of this motion, the Court has accepted the chronology set forth in the Defendant's memorandum.

5

### III.  DISCUSSION

Mr. McCurdy raises two general objections to the police search.  First, as regards the contents of the rucksack and the gun case, he argues that Paula Sawtelle did not have the either actual or apparent authority to consent to a search of Mark McCurdy's home and, if she did, she did not give consent to the search.  Second, as regards the gun case, Mr. McCurdy claims that the police had no right to undertake a warrantless search of the gun case at the sheriff's department.

### A.  The Search at Mr. McCurdy's Home

#### 1.  Consent and Authority:  General Principles

As the police did not obtain a search warrant, the search of the McCurdy home is presumptively unreasonable.  "The Fourth Amendment generally requires the police to obtain a warrant before entering and searching a person's home."  *United States v. Meada*, 408 F.3d 14, 20 (1st Cir. 2005); *see also United States v. Beaudoin*, 362 F.3d 60, 65 (1st Cir. 2004) ("A warrantless search involving an intrusion into someone's home is presumptively unreasonable under the Fourth Amendment.").  The Government bears the burden to establish by a preponderance of the evidence the legality of the warrantless search and here it seeks to do so by demonstrating that it obtained consent.  *See United States v. Winston*, 444 F.3d 115, 121 (1st Cir. 2006).

Nevertheless, the "police need not seek a warrant where 'voluntary consent has been obtained, either from the individual whose property is searched, or from a third party who possesses common authority over the premises.'"  *Meada*, 408 F.3d at 20 (quoting *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990)).  The defendant need not be the one to provide the consent to the police.  The Supreme Court has held that "the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with

whom that authority is shared." *United States v. Matlock*, 415 U.S. 164, 170 (1974). As the First Circuit has pointed out, "[e]ven if a person does not in fact have such authority, police may rely on her consent if they reasonably believe that she has such authority." *Meada*, 408 F.3d at 21.[4] The standard is an objective one: "[W]ould the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?" *Rodriguez*, 497 U.S. at 188 (quoting *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968) (internal quotation marks omitted)). "The existence of consent and the voluntariness thereof are questions of fact to be determined from all the circumstances surrounding the search." *Winston*, 444 F.3d at 121 (citing *United States v. Miller*, 589 F.2d 1117, 1130 (1st Cir. 1978)).

### 2. The Deputy's Reasonable Belief in Paula Sawtelle's Authority to Consent to the Search of the McCurdy Home

The first question is whether Ms. Sawtelle had common authority over the premises, such that she was entitled to give consent to enter the Defendant's house and search the attic. Pointing to several periods during which Ms. Sawtelle did not actually live at the Whiting address, the Defendant argues that her status at his residence was as a "temporary guest." *Def.'s Mem.* at 4-5.[5] In fact, Ms. Sawtelle testified at the suppression hearing that she always felt like a guest

---

[4] In *Meada*, the defendant's girlfriend consented to a search of his apartment, and told the police that she had been living with him for two months. When the officers arrived, she led them to the firearms in his apartment. The district court denied the motion to suppress, noting numerous circumstances supporting a reasonable belief that the girlfriend had authority to consent, including the fact that she kept certain personal possessions at the defendant's apartment, that she could enter his apartment in his absence, and that the officer had independent knowledge that the woman's car had been parked outside defendant's apartment on numerous occasions. On appeal, the defendant asserted that the girlfriend did not have authority to consent and that it was unreasonable for the police to believe she did. The First Circuit upheld the district court's denial. *Id*. at 26.

[5] The Defendant cites *Illinois v. Rodriguez*, 497 U.S. 177 (1990), for the proposition that "a one-time joint-occupant may lose common authority status." *Def.'s Mem.* at 4. The facts underlying *Rodriguez* are dissimilar:

> The evidence showed that although [the victim], with her two small children, had lived with [the defendant] beginning in December 1984, she had moved out on July 1, 1985, almost a month before the search at issue here, and had gone to live with her mother. She took her and her children's clothing with her, though leaving behind some furniture and household effects. During the period after July 1 she sometimes spent the night at [the defendant's] apartment, but never

7

there. Conversely, the Government focuses on other facts: "She had a key to the location. She came and went as she pleased. She kept her belongings there. She slept there. She took meals there. She had guests there. When she went on vacation to visit her son in Florida, she left from and returned to the residence." *Gov't Mem.* at 3-4. In addition, immediately before leaving for Florida – from early January to February 2006 – she lived at the Whiting address.

      The Court need not resolve this issue on the question of actual authority. Even assuming *arguendo* that Ms. Sawtelle did not have common authority over the premises, there is no Fourth Amendment violation if Deputy Rolfe reasonably believed she had authority to consent to a search of Mr. McCurdy's residence. Here, the evidence is overwhelming that Deputy Rolfe reasonably believed that Ms. Sawtelle had proper authority to consent to the search. First, Deputy Rolfe was responding to a domestic assault complaint at 17 Hopkins Lane in Whiting – the Defendant's residence. Although it is not inconceivable a domestic assault victim would have no right to be present at the alleged perpetrator's home, there is no evidence that such was the case here and Mr. McCurdy made no mention of such a claim when he spoke with Deputy Rolfe, who was en route to the McCurdy home.

      But, more significantly, the scene that greeted Deputy Rolfe at the McCurdy residence was wholly consistent with a typical family in residence. Ms. Sawtelle's entire family was present at the home: her adult son, her teenaged daughter, and her one-year-old granddaughter. Upon being greeted by Ms. Sawtelle and her son, Deputy Rolfe was informed that the alleged

---

> invited her friends there, and never went there herself when he was not home. Her name was not on the lease nor did she contribute to the rent. She had a key to the apartment, which she said at trial she had taken without [the defendant's] knowledge . . . .

*Id.* at 181. The Court found that the state had not met its burden of establishing common authority. Here, however, Ms. Sawtelle was living in the house on the date of the search, and had been living there immediately prior to her vacation in Florida. She kept some of her and her daughter's personal belongings in the home, came and went as she pleased, and had her own key to the house. The Defendant's reliance on *Rodriguez* is misplaced.

8

assault had taken place in the early morning as she was leaving the McCurdy home to buy the daily newspaper; both the timing and nature of Ms. Sawtelle's pre-assault actions were consistent with routine family activity. Further, Ms. Sawtelle informed Deputy Rolfe that she and Mr. McCurdy had been living together for six years and she told the deputy that she was going to pack up her things and move out, a statement consistent with the fact that she had her personal items in the house. Finally, she listed her residence and mailing address on her victim statement as 17 Hopkins Lane, the McCurdy address.[6] In short, by all appearances, Ms. Sawtelle was living at the McCurdy home surrounded by her family and her possessions and had the run of the house. The Court concludes that Deputy Rolfe had the reasonable belief that Paula Sawtelle had the authority to consent to a search of the McCurdy house.

### 3. The Search of the Attic

The Court must next consider whether Ms. Sawtelle had common authority over the attic, such that she could provide valid consent for Deputy Rolfe to search there. In addition to the evidence concerning Ms. Sawtelle's apparent authority over the McCurdy home generally, there was additional evidence regarding the attic. The testimony revealed that: (1) Ms. Sawtelle knew that the Defendant kept some ammunition and firearms stored in the attic;[7] (2) Ms. Sawtelle's son was aware of the same information; (3) Ms. Sawtelle's son knew how to access the attic; (4) the attic was not cordoned off, but was readily accessible by fold-down stairs which came into the living room; and, (5) by nodding her head and by failing to object to the obvious entry into the attic by her son and Deputy Rolfe, Ms. Sawtelle appeared to have the authority to allow them upstairs. By contrast, there was no evidence at all from which Deputy Rolfe could have

---

[6] The Court accepts Deputy Rolfe's explanation for the reasons he listed Ms. Sawtelle's son's address in Machias as her residence on the cover sheet of the police report.

[7] If the attic was somehow off bounds to Ms. Sawtelle, it is odd that she would know what Mr. McCurdy stored there.

9

reasonably concluded that, even though Ms. Sawtelle was living in the house, she was restricted from access to the attic.

From these facts, the Court again concludes that even assuming *arguendo* that Ms. Sawtelle did not have common authority over the attic, it would have been entirely reasonable, under the circumstances, for Deputy Rolfe to believe that she had authority over the attic. Deputy Rolfe was able to consider all the circumstances that led to his reasonable belief that she had the authority to consent to a search of the McCurdy home. There was no indication that the attic was solely for the Defendant's use, but every indication that the attic was accessed by Ms. Sawtelle and members of her family. The Court finds that Deputy Rolfe reasonably believed that Ms. Sawtelle had the authority to give consent to his search of the McCurdy attic.

### 4. Consent to Search the Attic

The next question is whether she did, in fact, provide voluntary consent to search the house, including the attic where Deputy Rolfe found the firearm. The First Circuit has ruled that "consent may be express or inferred from conduct," also called "implied-in-fact consent." *Winston*, 444 F.3d at 121. Nonverbal communications can form the basis for implied-in-fact consent. *See id.* at 122 (finding implied-in-fact consent to search when a defendant motioned to a nightstand with his shoulder);[8] *Miller*, 589 F.2d at 1130 (finding implied-in-fact consent to search when the defendant unlocked his suitcase).

---

[8] In *Winston*, the court detailed the interaction between the defendant and the police officers:

> Upon being asked for verification of his identity, he verbally indicated that his wallet was in the nightstand in the bedroom. The agents could not immediately locate the nightstand in the bedroom, so they escorted Winston into the bedroom. When asked again for the location of his identification, he indicated with a shoulder movement in the direction of the nightstand. While the agents did not explicitly ask for permission to open the drawer to retrieve Winston's identification, the circumstances described would reasonably lead the agents to conclude that Winston was consenting to the opening of the drawer in the nightstand to allow for the retrieval of his wallet and identification. Any other

10

The Defendant argues that Ms. Sawtelle's acquiescence in Deputy Rolfe's presence in the home and search of the attic does not amount to consent, and points to *United States v. Weidul*, 325 F.3d 50 (1st Cir. 2003). *Weidul* involved a similar issue: whether the defendant's fiancée voluntarily consented to a search of her house for the defendant's firearms. In *Weidul*, the defendant had called the emergency department of the Southern Maine Medical Center and threatened to "blow his head off." *Id.* at 52. After the police responded and removed the defendant from the house, five police officers returned and re-entered it without permission. In the fiancée's presence, the police captain instructed the officers to search the woman's house for weapons. As one officer approached the kitchen, he said: "I'm going to look in here, okay?" When she did not respond, he nonetheless entered. He then approached the laundry room and told her: "I'm going to look in here." The woman responded: "Okay." *Id*. at 54. Inside the laundry room and under some dirty clothes, the officer discovered a weapon. The magistrate judge suppressed evidence of the firearm because he concluded the Government had failed to demonstrate voluntary consent to the search. The First Circuit affirmed.

In affirming, however, the First Circuit pointed out that, under the clearly erroneous standard of review, the magistrate's factual findings on the voluntariness of the woman's consent only had to be fairly supported by the record. Under the totality of the circumstances, the evidence supported the magistrate's finding that the woman did not voluntarily consent to the search and instead was simply acquiescing "to what any reasonable person would have perceived, under the circumstances, as police conduct tantamount to a claim of lawful authority to search for weapons." *Id.* at 54 (quoting *Weidul*, 227 F. Supp. 2d 161, 167-68 (D. Me. 2002)).

---

conclusion would allow Winston the benefits of sandbagging the agents into committing a violation of his rights.

*Id*. at 121.

The circumstances here are dissimilar. Here, the police had been called to the scene because of a complaint from Ms. Sawtelle in which they were informed that Mr. McCurdy was a felon and had a weapon. When the deputy arrived, Ms. Sawtelle invited the deputy into the McCurdy home and both Ms. Sawtelle and Mr. Cheney confirmed that the firearm was in the attic. When her son stated that the firearm was in the attic, Ms. Sawtelle nodded.

The facts of a case from a different circuit are more germane. In *United States v. Wesela*, 223 F.3d 656 (7th Cir. 2000), the defendant's wife called the police and reported that her husband was armed and threatened to kill her. She also reported that he was sleeping and wanted the police to come arrest him. After the police arrived, one officer began questioning the wife while the other began collecting evidence. Although the officer did not ask for consent to search, the woman did not object to what he was doing. During the search, the officer recovered the gun, and the defendant was charged with being a felon in possession of a firearm. The Seventh Circuit upheld the district court's denial of the motion to suppress, finding that the facts demonstrated the wife's implicit consent to search the apartment. The court noted that the wife called the police "for the express purpose of ridding her house of the threat posed by her (armed) husband," and that she told them where they could find the gun. *Id*. at 661. The court further noted that the officer's search was confined to the limited purpose of finding the firearm at issue, and if he had "conducted an all-out search of the [] home, perhaps the result would be different." *Id*.

The Court views the circumstances in this case as more like *Wesela* and less like *Weidul*.[9] Here, when they reported the domestic assault, Ms. Sawtelle and Mr. Cheney informed the police that there were firearms in the house. When he arrived, Deputy Rolfe learned not only that there were firearms and ammunition in the house, but also that Mr. McCurdy was a felon and prohibited from possessing them. Thus, the police had been called to the home in part to investigate the presence of firearms and, once there, had been again alerted to their presence. It would have been passing strange for Ms. Sawtelle to refuse to allow the police to retrieve the items she had called them to get.

At this point, when Mr. Cheney offered to get the guns, Ms. Sawtelle nodded her head. Although he did not specifically ask her if he could go into the attic to recover the weapons, Deputy Rolfe reasonably took her nodding as her voluntary consent to enter the attic. Deputy Rolfe's entry into the attic was open and apparent. Living room furniture had to be moved to pull the attic staircase down and then both he and her son proceeded up the stairs. Again, it defies common sense to conclude that Ms. Sawtelle was oblivious to the obvious.

Once in the attic, Deputy Rolfe's search of the house was limited to finding the firearm; it was not an "all-out search" of the McCurdy residence. When he came downstairs with the gun

---

[9] The Defendant raises *Georgia v. Randolph*, __ U.S. __, 126 S. Ct. 1515 (2006), contending: "More significantly, the Supreme Court of the United States recently affirmed that vitality of fourth amendment protections in the context of a domestic disturbance." *Def.'s Mem.* at 12. In *Randolph*, the defendant's wife had called the police after the defendant had taken their son away. When the police arrived, the defendant's wife told them that he was a cocaine user, that there was evidence of it in the house, and she gave consent to search the house. The defendant, who had returned to the house in the meantime, had already refused to allow the police into the home. The case stands for the proposition that "a physically present inhabitant's express refusal of consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant." *Id.* at 1528. *Randolph* has little application here, since Mr. McCurdy was not present at the scene to expressly refuse consent to search the attic.
   Mr. McCurdy raises the novel argument that *Randolph* controls because he was in police custody and Deputy Rolfe could have contacted him to obtain his consent. Although the Defendant's argument is inventive, the Court cannot agree with the Defendant. *Randolph*'s holding is expressly limited to defendants who are physically present and expressly refuse consent. There is no indication *Randolph* would extend to absent, but potentially reachable defendants who, if reached, might refuse consent.

case and rucksack, Ms. Sawtelle did not object to his taking these items out of the home.[10] Considering the totality of the circumstances, the Court finds that Ms. Sawtelle consented to the search of the attic to recover the firearm and ammunition.

### B.     The Search of the Gun Case at the Sheriff's Department

The final issue is whether Deputy Rolfe violated Mr. McCurdy's Fourth Amendment rights by seizing his gun case in the attic and later opening it at the sheriff's department. The evidence establishes that after Deputy Rolfe left the McCurdy residence with the gun case, he took it to the sheriff's department and then went to the emergency room to speak with Mr. McCurdy. During their conversation, Deputy Rolfe asked Mr. McCurdy whether he had a key to the gun case, and the Defendant responded that he had no knowledge of a gun case in the house. Deputy Rolfe followed up, asking directly if the gun case and rucksack belonged to him, which the Defendant denied. Upon returning to the sheriff's department, Deputy Rolfe pried open the gun case and found the firearms and ammunition. In the so-called "web harness," he also found nine fully loaded magazines and two rounds for the grenade launcher.

The Government argues that the Defendant lost his expectation of privacy in the gun case when he disavowed ownership of it. *See Gov't Mem.* at 9-10. Mr. McCurdy offers a different take:

> Surely, the Defendant's choice not to incriminate himself to the officer does not incapacitate him from complaining about the seizure and search of the case. The question of standing is not whether the Defendant admits possession but, rather, whether the

---

[10] At the suppression hearing, Ms. Sawtelle's account varied considerably from Deputy Rolfe's account and from her own testimony before the grand jury. She did not recall where she was in the house when Mr. Cheney and Deputy Rolfe went into the attic, and she did not recall whether Deputy Rolfe asked her about her use of the attic. According to Ms. Sawtelle, Deputy Rolfe did not ask her about the presence of a firearm. She also did not know why they were going into the attic, and she did not recognize the gun case or rucksack that they brought down. Having had the opportunity to see and evaluate Ms. Sawtelle's testimony and assess her credibility, the Court does not accept Ms. Sawtelle's suppression hearing testimony as regards the events surrounding the search of the attic and the discovery and removal of the firearms and ammunition.

> facts demonstrate that he has manifested an expectation of privacy in the item which society recognizes as reasonable.

*Def.'s Mem.* at 15 (citing *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring)). The Defendant further contends that his expectation of privacy was evidenced by the fact that the case was locked and stored in his closed-off attic.

Mr. McCurdy's argument is unavailing, because by abandoning any claim to the gun case, he abandoned any standing to challenge its search. "An expectation of privacy is the threshold standing requirement that a defendant must establish before a court can proceed with any Fourth Amendment analysis." *United States v. Samboy*, 433 F.3d 154, 161 (1st Cir. 2005) ("a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable"). As the First Circuit has pointed out, abandonment of property adversely affects one's expectation of privacy:

> One who abandons ownership forfeits any entitlement to rights of privacy in the abandoned property . . . and one who disclaims ownership is likely to be found to have abandoned ownership . . . . Phrased another way, disclaiming ownership is tantamount to declaring indifference, and thus negates the existence of any privacy concern in a container's contents.

*United States v. Zapata*, 18 F.3d 971, 978 (1st Cir. 1994) (citations omitted); *see also United States v. De Los Santos Ferrer*, 999 F.2d 7, 9 (1st Cir. 1993) ("It is well established that one who abandons or disclaims ownership of an item forfeits any claim of privacy in its contents, and that as to that person the police may search the item without a warrant."); *Miller*, 589 F.2d at 1131; *United States v. Brown*, No. 05-70-P-S, 2006 U.S. Dist. LEXIS 1628, at *16 (D. Me. Jan. 17, 2006); *United States v. Paquette*, No. 04-10-B-W, 2005 U.S. Dist. LEXIS 6869, at *13-14 n.3 (D. Me. Apr. 12, 2005); *see also United States v. Denny*, 441 F.3d 1220, 1227 (10th Cir. 2006) ("Even where a suspect does not subjectively intend to relinquish all ownership interest in an

15

item, such suspect may nevertheless relinquish his or her reasonable expectation of privacy in the item.").

When Mr. McCurdy feigned ignorance of the gun case and then directly asserted it did not belong to him, he extinguished any legitimate expectation of privacy that he had with respect to its contents. Moreover, Mr. McCurdy's contention that his failure to acknowledge ownership was a "choice not to incriminate himself" is factually inaccurate. *Def.'s Mem.* at 15. He did not remain silent; he affirmatively denied knowledge and ownership. Upon denying ownership, he relinquished standing to challenge a search of property he said was not his. "Any other conclusion would allow [the Defendant] the benefits of sandbagging [Deputy Rolfe] into committing a violation of his rights." *Winston*, 444 F.3d at 121.[11]

## IV. CONCLUSION

The Court concludes that (1) Deputy Rolfe reasonably believed that Ms. Sawtelle had authority to provide consent to search the Defendant's residence, including his attic; and, (2) the Defendant abandoned any reasonable expectation of privacy in his gun case. The Court DENIES Defendant's motion to suppress (Docket # 11).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 26th day of March, 2007

---

[11] As Ms. Sawtelle had apparent authority to consent to a search of the McCurdy residence and attic and Mr. McCurdy had no reasonable expectation of privacy with respect to the gun case, the Court need not reach whether the inevitable discovery doctrine provides additional justification for the warrantless searches.