UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR-06-80-B-W |
| | ) | |
| MARK McCURDY | ) | |

**SUPPLEMENTAL ORDER ON MOTION TO SUPPRESS**

Presented with newly-discovered evidence of the circumstances surrounding a law enforcement search and seizure of the Defendant's firearm at his residence, the Court has weighed the testimony of the new witness, who testified that the Defendant's girlfriend did not consent to the search and seizure, against countervailing evidence. The Court rejects the newly-presented version of events and affirms its earlier ruling that the Defendant's girlfriend consented to the search of his residence and the seizure of his firearm.

**I.     STATEMENT OF FACTS**

**A.     The Supplemental Hearing**

After a hearing on the matter, on March 26, 2007 the Court denied Mark McCurdy's motion to suppress, concluding that a warrantless search of his home passed constitutional muster. *United States v. McCurdy*, 480 F. Supp. 2d 380 (D. Me. 2007); *Order on Mot. to Suppress* (Docket # 30) (*McCurdy*).[1] On June 6, 2008, Mr. McCurdy moved to re-open the suppression hearing on the ground of newly-discovered evidence, and on July 3, 2008 the Court

---

[1] The Court also concluded a second warrantless search of a gun case at the sheriff's department was constitutional. *McCurdy*, 480 F. Supp. 2d at 382. Mr. McCurdy has not separately challenged this conclusion, but if evidence of the gun case, which was garnered from the search of the home, must be suppressed, it follows that evidence of the subsequent search of the gun case would be similarly inadmissible.

granted the motion to re-open.[2] *Def.'s Mot. to Re-Open Hr'g on Mot. to Suppress* (Docket # 78); *Order on Def.'s Mot. to Re-Open Hr'g on Mot. to Suppress* (Docket # 91). A second hearing was held on September 16, 2008. *Minute Entry* (Docket # 99). The parties agreed that, in arriving at its decision on whether to vacate its denial of the suppression motion, the Court could consider evidence presented at the February 8, 2007 suppression hearing as well as the new evidence. On October 15, 2008 and October 21, 2008, the Defendant and the Government respectively filed memoranda. *Def.'s Mem. and Argument in Supp. of Mot. to Suppress* (Docket # 108); *Gov't's Mem. and Argument in Further Opp'n to Mot. to Suppress* (Docket # 109).

**B.     The March 26, 2007 Order**

In its Order, the Court found that Mr. McCurdy's girlfriend, Paula Sawtelle, had apparent authority to consent to a search of his home, including the attic, and that she had voluntarily consented to the search. *McCurdy*, 480 F. Supp. 2d at 386-90. It based this finding largely on the testimony of Deputy Jonathan Rolfe, the deputy sheriff who performed the search. In summary, Mr. McCurdy and Ms. Sawtelle and her son Stephen (Jon) Cheney had been involved in an early morning altercation on March 27, 2006 in front of Mr. McCurdy's home. After Mr. McCurdy left, Ms. Sawtelle and Mr. Cheney called law enforcement to the McCurdy home, and informed the police that Mr. McCurdy had firearms in the house. After Deputy Rolfe arrived at the McCurdy residence, he interviewed Ms. Sawtelle and Mr. Cheney. *Feb. 8, 2007 Tr.* 20:3-25; 21:1 (Docket # 72). They confirmed to Deputy Rolfe that there were firearms in the house, and that Mr. McCurdy was a felon. *Id.* 21:22-25; 22:1-9; 22:18-22; 42:13-15.

---

[2] The delay between March 26, 2007 and June 6, 2008 merits an explanation. On October 9, 2007, Mr. McCurdy pleaded guilty to the charge of being a felon in possession of a firearm, a violation of 18 U.S.C. § 922(g)(1). *Minute Entry* (Docket # 57). At the Rule 11, the Court informed Mr. McCurdy that his maximum exposure for incarceration was ten years. However, once the Presentence Report was completed, it was disclosed that he may have a criminal history that could trigger Armed Career Criminal status and subject him under 18 U.S.C. § 924(e) to a mandatory minimum prison term of 180 months. This news prompted Mr. McCurdy to file a motion to withdraw his guilty plea, which the Court granted on May 2, 2008. *Def.'s Mot. to Withdraw Plea* (Docket # 73); *Order Granting Mot. to Withdraw Guilty Plea* (Docket # 74).

Mr. Cheney said the firearms were in the attic and Ms. Sawtelle nodded. *Id.* 24:3-13. Mr. Cheney pulled down the staircase leading to the attic and began to ascend the stairs. Deputy Rolfe followed Mr. Cheney into the attic and, once there, Mr. Cheney handed Deputy Rolfe a black bag and pointed to a plastic case. Deputy Rolfe took possession of the bag and the case and took them with him as he left the house. Upon arriving at the sheriff's department, the deputies opened the case and inside they discovered a Colt AR-15 .233 rifle, a M203 gas grenade launcher, an upper .223 caliber rifle assembly, and two loaded magazines. *Gov't Feb. 8, 2007 Ex.* 1 at 3 (*Rolfe Rpt.*). The evidence during the original motion to suppress hearing established that the following people were present at the time of the search of the McCurdy residence: Deputy Jonathan Rolfe, Deputy Fuller, Paula Sawtelle, Jon Cheney, his sister, and K.C., Jon Cheney's infant daughter.

### C. Scott Huckins' Testimony

Enter Scott Huckins. According to Mr. McCurdy, in early December, 2007, he had a chance encounter with Scott Huckins. *Aff. of Mark McCurdy* ¶ 6 (Docket # 78-2). Mr. Huckins told Mr. McCurdy that he had been present during the law enforcement search of the McCurdy home on March 27, 2006. *Id.* ¶ 9. Mr. Huckins' presence at the search came as a complete surprise to Mr. McCurdy, who was not at home at the time of the search. *Id.* ¶ 10. Mr. Huckins' news led to the motion to re-open and the second suppression hearing.

The defense called Mr. Huckins to testify at the second hearing. Mr. Huckins testified that he is a thirty year-old commercial fisherman, living in Lubec, Maine. He has known Jon Cheney[3] for years; they grew up near each other and were neighborhood friends. Sometime in 2006, Mr. Huckins learned that Mr. Cheney had returned from Florida and was staying at Mr.

---

[3] The name of Ms. Sawtelle's son caused some confusion. His name is Stephen, but he goes by Jon. Further, the parties have spelled his name John, but in her written statement, Ms. Sawtelle spelled her son's name Jon. *Gov't Feb. 8, 2007 Ex.* 2 (*Sawtelle Witness Statement*). The Court uses the mother's spelling.

McCurdy's home. They got back in touch and had general conversations and exchanged phone calls. Mr. Huckins testified that in the morning of March 27, 2006, he received a call from Mr. Cheney. Mr. Cheney said that there had been an altercation between Mr. McCurdy and him and that he wanted to move out of the McCurdy home. He asked for Mr. Huckins' help. Mr. Huckins agreed and drove to the McCurdy residence.[4] When he arrived, Deputy Rolfe was already there and Deputy Fuller came shortly thereafter. Upon parking his truck, Mr. Huckins observed Deputy Rolfe walking down the hill towards the McCurdy home. Deputy Rolfe met Jon Cheney at the bottom of the hill, where the two discussed what happened earlier that morning. Mr. Huckins, who followed Deputy Rolfe down the hill, overheard this conversation.

He recalled that Mr. Cheney told Deputy Rolfe that Mr. McCurdy had taken Ms. Sawtelle out of the truck and that Mr. McCurdy and he had been involved in an altercation. He said that Mr. Cheney told Deputy Rolfe that Mr. McCurdy and he had struck each other several times and that Mr. McCurdy had driven off. He said Mr. Cheney confirmed that there were no firearms involved in the altercation. At this point, all three men went inside.[5]

When they entered the McCurdy residence, Mr. Huckins saw Ms. Sawtelle sitting toward his left across the room. Mr. Huckins said that he knows Ms. Sawtelle from growing up near her, and within a few minutes he recognized that Ms. Sawtelle was in a spell. He said that he had seen her this way perhaps five times before, and these non-responsive spells are usually brought on by stress.[6] Ms. Sawtelle did not acknowledge Mr. Huckins' presence, though he tried

---

[4] Mr. Huckins went to the McCurdy residence with his father, Barry Huckins. Unfortunately, according to Scott Huckins, Barry Huckins suffers from a number of conditions that render him unable to testify.

[5] Mr. Huckins also recalled that Mr. Cheney told Deputy Rolfe what Mr. Huckins was doing there after Deputy Rolfe had noticed him and inquired about his business at the McCurdy home. Mr. Huckins did not recall speaking to Deputy Rolfe directly at any time.

[6] He recalled that Ms. Sawtelle experienced these spells when her mother died, when Mr. Cheney was arrested for violating his probation, and when Mr. Cheney stole her car and drove across the United States border into Canada.

to engage her. He said that she sat with her hands over her eyes, rocking back and forth like a baby.

Jon Cheney and Deputy Rolfe continued to discuss matters in front of Ms. Sawtelle. She did not respond even though Mr. Huckins believed she could overhear their conversation. By that time, Deputy Fuller arrived, and Mr. Huckins and his father were speaking with him by the front door. Mr. Huckins said that Deputy Rolfe announced that he was going to secure the residence. He heard Jon Cheney inform the deputy that it was not his place and he could not consent. Ms. Sawtelle did not respond to this conversation; she just continued to rock. Deputy Rolfe then proceeded to search the couches, the television stand, the desk, and the area of the living room behind the couches. He also searched the bedroom, in which Mr. Huckins and Mr. Cheney had begun disassembling a bed in preparation for moving. He checked behind the bedroom door and underneath the bed, but did not open any drawers. Deputy Rolfe then asked about the trap door in the ceiling. Deputy Rolfe pulled the trap door open and the ladder down. He did not need to move furniture to do so. He turned and asked Ms. Sawtelle if he could go up the ladder to secure the premises; she did not respond verbally and continued rocking back and forth. He proceeded upstairs. When Deputy Rolfe returned from the attic with a black case, Ms. Sawtelle told him not to take her daughter's clarinet. Deputy Rolfe replied that he needed to search the case. Ms. Sawtelle again asked him not to carry away her daughter's clarinet case. Deputy Rolfe removed the case from the house and returned to his car.

On cross-examination, Mr. Huckins confirmed that Deputy Rolfe arrived at the McCurdy home before he did, and that Deputy Fuller arrived afterwards. He recalled the following people were present at the McCurdy residence: Deputies Rolfe and Fuller, Barry Huckins, K.C., Shaley Anthony, a state of Maine Department of Human Services (DHS) worker, Paula Sawtelle, Jon

5

Cheney, and himself. He said that he never saw Ms. Sawtelle complete any forms for Deputy Rolfe. He confirmed that Deputy Rolfe searched the ground-floor of the residence and that after Deputy Rolfe exited the bedroom, he and his father went into the bedroom and took the bed apart. He said that Deputy Rolfe went into the attic alone, unaccompanied by Jon Cheney. He recalled Deputy Rolfe returned from the attic carrying only a black case about three feet long. During Deputy Rolfe's search of the ground-floor and attic, Mr. Huckins continued to remove Jon Cheney's items from the house at his direction, making approximately three trips in and out of the house.[7] In fact, Mr. Huckins recalls that he had to back his truck down the hill to the McCurdy residence to load the furniture and before doing so, asked Deputy Fuller to move his patrol car. Mr. Huckins said that he filled his truck with furniture and hauled it away a number of times that morning.

### D. Marilyn DiBonaventuro

The Government called as a witness Marilyn DiBonaventuro, a Victim Witness Specialist at the United States Attorney's Office. Ms. DiBonaventuro testified about two telephone conversations. The first was between Joel Casey, Assistant United States Attorney, and Mr. Huckins on March 24, 2008, which she listened to at Mr. Casey's request. The second was her conversation with the state of Maine DHS Office in Machias, Maine, on September 16, 2008. Ms. DiBonaventuro overheard Mr. Huckins tell Mr. Casey that the case Deputy Rolfe removed from the McCurdy home was a big silver case four feet by one and one-half feet, like a pool stick or clarinet case. *See Gov't Sept. 16, 2008 Ex.* 2 (*DiBonaventuro Notes: Huckins*). She also learned that Ms. Anthony was present because Mr. Cheney's ex-wife had called DHS about his bringing their daughter to Maine while there was an ongoing custody battle. *Id.*

---

[7] On re-direct, however, Mr. Huckins clarified that he removed the first load of furniture after Deputy Rolfe came down from the attic with the three-foot case.

To fix the time Ms. Anthony was at the McCurdy home on March 27, 2006, Ms. DiBonaventuro contacted Kelly Barnes, Ms. Anthony's former supervisor at DHS. Upon reviewing the DHS computerized records, Ms. Barnes confirmed that Ms. Anthony arrived at the McCurdy home at 10:20 a.m. and remained one hour. *See Gov't Sept. 16, 2008 Ex.* 3 (*DiBonaventuro Email: DHS*).

E.     **Deputy Rolfe's Rebuttal**

Deputy Rolfe testified in rebuttal. With the aid of a radio log generated by regional communication center dispatchers, *Gov't Sept. 16, 2008 Ex.* 1 (*Dispatch Log*), Deputy Rolfe was able to fix the time he was present at the McCurdy home. He arrived at the McCurdy home at 6:34 a.m., Deputy Fuller arrived at 6:15 a.m., and Deputy Fuller and Deputy Rolfe cleared the scene at 7:14 a.m. and 7:16 a.m., respectively.[8] He confirmed his earlier testimony that he found a black case and black bag in the attic, carried them down the stairs, and removed them from the house at the same time. He acknowledged that Ms. Sawtelle informed him that she intended to move out of the McCurdy residence after the investigation was completed. But, he denied that anyone was moving personal items out of the house during his investigation and search for the firearms, and stated that he would not have allowed that to happen. To do so would be contrary to standard police practice, which required him to secure the scene, maintain safety, and assure the continuity of any evidence.

---

[8] On cross-examination, Deputy Rolfe specifically recalled that Deputy Fuller arrived before he did, which is consistent with his earlier testimony. *Feb. 8, 2007 Tr.* 25:11-17; 37:5-7; 43:19-21. He also explained why the radio log could be interpreted to indicate that Deputy Fuller arrived at the McCurdy residence at 6:46 a.m., almost fifteen minutes after he did. Apparently, the dispatcher may not have recorded as an "arrival" Deputy Fuller's 6:15 a.m. 10-02 call, which Deputy Rolfe understood to mean that Deputy Fuller already had the residence secured by 6:15 a.m., more than fifteen minutes before Deputy Rolfe's arrival. The Court credits this explanation and Deputy Rolfe's consistent recollection of the fact that Deputy Fuller arrived before he did. Moreover, this sequence of events is consistent with the fact that Deputy Rolfe's trip to the McCurdy residence was delayed by his detour to Mr. McCurdy's traffic stop in Machias. *Feb. 8, 2007 Tr.* 14:12-25; 15:1-24.

He said that the following people were present when he was at the McCurdy residence: Deputy Fuller, Paula Sawtelle, Jon Cheney, Jon Cheney's girlfriend,[9] and an infant. He said that neither Mr. Huckins, whom he does not know well but recognized when they testified from his work in the area, nor Ms. Anthony was present at the McCurdy residence when he was there on the morning of March 27, 2006.

## II.  DISCUSSION

### A.  General Legal Principles

The Fourth Amendment establishes a general proscription against warrantless searches of a person's home:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. "[O]ne of the specifically established exceptions to the [Fourth Amendment] requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *United States v. Vilches-Navarrete*, 523 F.3d 1, 15 (1st Cir. 2008). In its prior Order, the Court determined that Ms. Sawtelle had apparent authority to consent to the search of the McCurdy home, including the attic, and concluded the search passed constitutional muster. *McCurdy*, 480 F. Supp. 2d at 386-88. The narrow factual question that has been re-opened is whether she actually gave consent. Based on the version of the events without Mr. Huckins' testimony, the Court previously

---

[9] On cross-examination, he admitted that Jon Cheney's girlfriend was present at the house, but he did not list her in his report; he explained that she was not involved and not interviewed. The Court has already found that Ms. Sawtelle's teenage daughter was present. *McCurdy*, 480 F. Supp. 2d at 387. It is possible Deputy Rolfe assumed that Mr. Cheney's sister was his girlfriend. On the other hand, it could be that both Mr. Cheney's sister and girlfriend were there. The Court need not solve this riddle. For these purposes, the fact that Deputy Rolfe failed to name in his report one or more potential witnesses is more important than the exact number or identities of unnamed potential witnesses. To minimize confusion, the Court refers to the unnamed potential witness as Mr. Cheney's girlfriend, without deciding that she was not his sister.

determined that Ms. Sawtelle consented to the search. *Id.* at 388-90. On the other hand, with Mr. Huckins' testimony, if fully accepted, it would be inescapable that Ms. Sawtelle did not consent to the search, since she was in some sort of a spell when she supposedly gave consent.

Because a consensual search falls within an established exception to the warrant requirement of the Fourth Amendment, the government bears the burden of proving that the search was consented to and within the scope of the consent. *United States v. Melendez*, 301 F.3d 27, 32 (1st Cir. 2002). The standard for the burden of proof in a motion to suppress is more likely than not. *United States v. Matlock*, 415 U.S. 164, 178 n.14 (1974) (stating that "the controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence"); *United States v. Schaefer*, 87 F.3d 562, 569 (1st Cir. 1996) (stating that "[t]he government bears the burden of proving by a preponderance of the evidence that an individual consented to a search of her person, property, or effects").

### B. An Irreconcilable Conflict

The contrasting versions of the events at the McCurdy residence during the morning hours of March 27, 2006 cannot be reconciled. Deputy Rolfe and Mr. Huckins disagree on a number of critical issues and there is simply no good explanation for how two people could emerge from the same event with such diametrically opposing recollections. To find the facts, the Court reviews and evaluates salient evidence.

#### 1. A Question of Motive

There are reasons to accept the testimony of Mr. Huckins. The first is motive. Mr. Huckins has nothing obvious to gain or lose from his testimony. He has been a friend of the Sawtelles, particularly with Ms. Sawtelle's son, Jon, and to the extent he might be influenced by friendship, this factor seems to run against Mr. McCurdy who is alleged to have assaulted Jon's

mother and Jon himself that morning. There is no evidence that Mr. Huckins is friendly with the Defendant. Second, the circumstances of his coming forward are not suspicious. If he had been inclined to fabricate his testimony, it would have been more effective to come forward earlier. Further, there is no suggestion that anyone prompted Mr. Huckins to volunteer this information. Mr. Huckins said he was a reluctant witness and appeared in court only because he "'couldn't dodge the subpoena anymore.'" *Def.'s Mem. and Argument in Supp. of Mot. to Suppress* at 2 (Docket # 108). Third, Mr. Huckins displayed detailed knowledge about what happened at the McCurdy residence that morning, knowledge that is consistent with his presence and personal observation of events.

There are also reasons to accept the testimony of Deputy Rolfe. Although he has the natural incentive to justify his law enforcement actions, including his search of the attic, Deputy Rolfe has no personal stake in the outcome of this case. For example, there is no suggestion he had prior dealings with any of the participants that would explain a motive in misrepresenting the facts. The defense has proffered no reason that Deputy Rolfe would testify erroneously under oath in federal court, and the Court is aware of none.

### 2. Imprecision in the Police Report

Deputy Rolfe's report lists the following people as present at the scene at the time of the assault: Paula Sawtelle, Mark McCurdy, and Stephen Cheney. When Deputy Rolfe testified, however, he listed the following people as present at the time of the search: Deputy Fuller, Paula Sawtelle, Stephen Cheney, an infant, and Mr. Cheney's girlfriend. The police report does not list either Scott Huckins or his father Barry. Ordinarily, the omission of these individuals would suggest that they were not present; however, the police report fails to list or name Mr. Cheney's girlfriend either.

The omission of the girlfriend may be explained by the difference between two investigations. The police report focuses on the domestic assault; this case, although interwoven with the alleged assault, focuses on possession of a firearm. The police report correctly lists Ms. Sawtelle, Mr. McCurdy, and Mr. Cheney as the sole witnesses to the assault, and the fact that there were other people in the house at the time of the police investigation is not especially relevant to whether a domestic assault took place in the yard outside the home. Even when the nature of the investigation is broadened to include Mr. McCurdy's firearm possession, the presence of other people in the home, such as Mr. Cheney's girlfriend, Mr. Huckins, and his father, would still not be directly relevant. Nevertheless, the omission of the name of Mr. Cheney's girlfriend also means that the omission of Mr. Huckins' name is not as significant as it would otherwise be.

A second concern is the description in the police report about Deputy Rolfe's seizure of what turned out to be the weapons case:

> While Paula and Stephen were filling out statement forms, they advised me that Mark was a felon and he had a firearm in the house. I asked if they could get it for me and they gave me a military harness with several loaded magazines in it. The ammunition in the magazines was .223 caliber. They also gave me a rifle case, which was locked, and said his gun was in the case and that he had used it last week target shooting. The case and the ammo were upstairs in the house.

*Gov't Feb. 8, 2007 Ex.* 1 at 2-3 (*Rolfe Rpt.*). The police report suggests that Paula Sawtelle and Jon Cheney retrieved the gun case and military harness and handed them to Deputy Rolfe. In fact, according to his testimony, after Deputy Rolfe followed Jon Cheney into the attic, Mr. Cheney handed Deputy Rolfe the military harness, but the deputy was less clear whether Mr. Cheney gave him the gun case or whether Mr. Cheney pointed to the case and the deputy

11

retrieved it.[10]  *Feb. 8, 2007 Tr.* 27:14-20; 29:14-21.  In any event, Ms. Sawtelle neither retrieved nor handed over the rucksack and weapons case.  Again, the imprecision in the report may reflect the deputy's concentration on the domestic assault, not the later firearms charge, and the important fact for purposes of the assault was that the weapons had been removed, not how they had been obtained.

### 3. The Greater Context

The discovery and removal of the weapons and ammunition must be viewed in a broader context.  At about 5:30 a.m., March 27, 2006, Ms. Sawtelle and Mr. McCurdy had an argument.  She announced she was taking his truck into town to buy a newspaper; he objected, telling her she could not use his truck.  She proceeded to the truck anyway; he followed.  When she got into the cab of the truck, he grabbed her and hauled her out of the truck.  She screamed for her son, Jon, who came running to his mother's rescue.  Mark McCurdy and Jon Cheney fought and during the fight, Mark McCurdy produced a knife, which Jon Cheney grabbed and threw into a field.  Mr. McCurdy then drove off in the truck.

What happened next is critical.  Jon Cheney called the police at 5:42:32 a.m.[11]  According to the Sheriff's Office record of Mr. Cheney's call:

> Mark McCurdy has assaulted Paula Sawtelle at residence.  Subject does have access to weapons.  Advised caller to call us back if subject leaves or something else happens.

*Gov't Sept. 16, 2008 Ex.* 1 (*Dispatch Log*).  The dispatcher called Ms. Sawtelle back at 6:00 a.m.:

---

[10] This uncertainty, however, does not undermine the Court's finding that Deputy Rolfe went up to the attic with Mr. Cheney.  *McCurdy*, 480 F. Supp. 2d at 384; *see Sawtelle June 7, 2006 Grand Jury Tr.* 10:5-7; *Feb. 8, 2007 Tr.* 26:17-19.  Nor does it undermine the Court's finding that Deputy Rolfe removed the case and the bag from the attic. *McCurdy*, 480 F. Supp. 2d at 390; *Gov't Feb. 8, 2007 Ex.* 1 at 3 (*Rolfe Rpt.*).

[11] Ms. Sawtelle testified before the grand jury that she brought the cordless telephone to her son, Jon, and he made the call.

> Called residence back at 0600 and spoke to Paula. She advised that Mark assaulted her by pulling her out of the truck and choking her this morning. He has not been drinking. Apparently there was a knife involved somehow. She saw her son throw it into the field. She was afraid that he was going to get gun and may come back . . . . Subject does have access to guns but do not believe he has any with him.

*Id.* What is clear from this exchange is that Ms. Sawtelle was not only reporting the assault, but was also very concerned about Mr. McCurdy's access to firearms.

When she testified before the grand jury on June 7, 2006, Ms. Sawtelle explained more of the background leading up to the incident. She said that she and Mark McCurdy had been together for six years and this was not the first time he had physically assaulted her. Although she denied being afraid of him, she described him as having a temper and being volatile. She also testified that he had been convicted of a crime which by her understanding involved a firearm.

Having reported both the assault and Mr. McCurdy's access to weapons, when the police arrived, it "would have been passing strange for Ms. Sawtelle to refuse to allow the police to retrieve the items she had called them to get." *McCurdy*, 480 F. Supp. 2d at 390. Even though Ms. Sawtelle may have been informed that Mr. McCurdy had been taken into custody, she could not have known whether and when he would be bailed. During her grand jury testimony, she admitted that because of Mr. McCurdy's volatility, she would be afraid if he learned that she had spoken with an ATF agent or that she had testified before the grand jury. On March 27, 2006, Ms. Sawtelle and her son had been involved in a physical altercation with Mark McCurdy; Mr. McCurdy had pulled a knife during the fight with Jon Cheney; they had called the police on him; he had been stopped and arrested; and, they had told the police about the assault and his access to firearms. Ms. Sawtelle had told the dispatcher that she was concerned that Mr. McCurdy would retrieve his firearm, and cause them harm. The surest way to assure that this did not happen was

13

to tell the officers where the firearms and ammunition were located and have them removed from the house.

Ms. Sawtelle's consent to the search of the attic and the seizure of the firearm and ammunition is wholly consistent with the broader context of the events that morning and her refusal would have been markedly inconsistent with her other actions.

### 4.   Ms. Sawtelle's Grand Jury Testimony

When she testified on June 7, 2006 before the grand jury, Ms. Sawtelle recalled that the police officer did not ascend to the attic to look for firearms alone, but was accompanied by Mr. Cheney. *Sawtelle June 7, 2006 Grand Jury Tr.* 10:5-7. She also described what happened when the officer emerged from the attic with the case:

> Q. At some point in time do you remember seeing a police officer come down from the attic carrying a case?
> A. Yes.
> Q. Had you seen that case before?
> A. No.
> Q. You had never seen that case before?
> A. No.
> Q. You've been with Mark for how many years?
> A. Six. I would say approximately six.
> Q. And in those six years you had never seen that case before?
> A. No. There were many things stored up there too. Like my daughter had musical instruments up there, which I knew. And he's an electrician, and he had a lot of stuff that was in cases and stuff. We were worrying about mildew at that point.
> Q. But that particular case that you saw the police come down with - -
> A. No. When they came downstairs, I asked them to open it. It was a locked case. It was locked. And I said please open it, let me see. And they said they couldn't open it. They refused to open it. I said I would open it, and they said no.
> Q. Did you suspect what was in the case?
> A. I probably at that point thought it might have been a gun.

*Sawtelle June 7, 2006 Grand Jury Tr.* 11:5-25; 12:1-5.

14

This testimony demonstrates that when the gun case was brought downstairs, Ms. Sawtelle was much more engaged than Mr. Huckins recalled. It also shows that Ms. Sawtelle confirmed her willingness to allow the police to open the case, a willingness consistent with the Court's earlier finding of consent and inconsistent with Mr. Huckins' recollection of a prolonged spell of non-responsiveness. Her grand jury testimony further confirms that Ms. Sawtelle believed that the black case contained a gun, not her daughter's clarinet. Mr. Huckins' memory of Ms. Sawtelle repeatedly asking the deputies not to take her daughter's clarinet is contradicted by Ms. Sawtelle's grand jury testimony.

### 5. The Written Statement: Timing and Common Sense

According to Mr. Huckins, he met Deputy Rolfe outside the McCurdy home and after a brief conversation between Deputy Rolfe and Mr. Cheney, the three went inside. According to him, from the time Mr. Huckins entered until the time Deputy Rolfe left with the gun case, Ms. Sawtelle was having one of her episodes, rocking back and forth in a spell. However, Mr. Huckins' description is contradicted by what is revealed in Ms. Sawtelle's written police statement.

Timing is critical. The dispatcher's log and Deputy Rolfe's testimony establish that Deputy Fuller arrived at the McCurdy home, at 6:15:46 a.m. on March 27, 2006. *Gov't Sept. 16, 2008 Ex.* 1 (*Dispatch Log*). Deputy Rolfe arrived at 6:34:29 a.m. *Id.* Deputy Rolfe testified that Ms. Sawtelle began completing the witness form before he went into the attic area. *Feb. 8, 2007 Tr.* 8:19-22.

Turning to Mr. Huckins' testimony, he arrived shortly after Deputy Rolfe and quickly positioned himself to overhear a conversation between Deputy Rolfe and Mr. Cheney outside the residence. He then followed them inside, found Ms. Sawtelle in a spell, and proceeded to pack

Mr. Cheney's belongings, while Deputy Rolfe and Mr. Cheney continued their discussion. At that point, according to Mr. Huckins, Deputy Fuller arrived. Significantly, Mr. Huckins describes Ms. Sawtelle as being in one of her episodes throughout the period from when he entered the McCurdy residence at least to when Deputy Rolfe went into the attic.

Contradicting this version of events, however, is a Witness/Complainants Statement written out and signed by Ms. Sawtelle. The top of the statement shows the date the statement was made, where the statement was made, who made the statement, and significantly, the time the statement was made. The statement was made by Paula Sawtelle at the McCurdy home in Whiting, Maine on March 27, 2006 at "6:45 A." *Gov't Feb. 8, 2007 Ex.* 2 (*Sawtelle Witness Statement*). The exhibit corroborates that Ms. Sawtelle handwrote a detailed description of the assault that morning at the very same time Mr. Huckins describes her as being in a non-communicative spell. Crediting Mr. Huckins' testimony would require discrediting objective evidence to the contrary.

In addition, crediting Mr. Huckins' testimony would run contrary to common sense. Mr. Huckins was very clear about the nature of the spell into which Ms. Sawtelle had fallen. It was so deep that, though she had known him well for an extended time, she did not even acknowledge his presence. She merely rocked back and forth with her face in her hands about "ninety percent of the time." From this unusual spell, Ms. Sawtelle would have had to awaken, write out a lucid description of the assault that morning, relapse into the spell, and reawaken as Deputy Rolfe descended from the attic to make certain that he was not carrying her daughter's clarinet case out of the house. The lapsing, awakening, and relapsing cycle is not only counterintuitive; Mr. Huckins nowhere described it.[12]

---

[12] The Government also isolates a contradiction between Mr. Huckins' description of the color of the gun case when he spoke to Marilyn DiBonaventuro, and the color of the case he testified to at the suppression hearing. During the

### 6.     Shaley Anthony: Timing

There is the matter of Ms. Anthony's presence at the McCurdy home. Mr. Huckins testified that Ms. Anthony, the state of Maine DHS worker, arrived at the McCurdy home about one-half hour after he arrived. Mr. Huckins testified that he arrived about the same time Deputy Rolfe arrived, and followed the deputy down the hill to the porch. The dispatch log fixes Deputy Rolfe's arrival at 6:34 a.m. and Deputies Fuller and Rolfe left the scene at 7:14 a.m. and 7:16 a.m., respectively. If Ms. Anthony arrived about half an hour after Mr. Huckins arrived, she would have been there before either deputy had left. But, Mr. Huckins' timing is incorrect. The DHS records confirm that Ms. Anthony did not arrive until 10:20 a.m. *Gov't Sept. 16, 2008 Ex.* 3 (*DiBonaventuro Email: DHS*). She arrived about three hours after the deputies had left. Of course, if he is correct that Ms. Anthony arrived at the scene one-half hour after he arrived, Mr. Huckins was not there when the deputies were there.

### 7.     Police Procedure

Finally, the sequence of events that Mr. Huckins described would be in stark contrast to basic police procedure. Deputy Rolfe had responded to a domestic violence complaint in which the complainant and/or her son had confirmed an altercation in which a knife was involved and a firearm was likely present. *Gov't Feb. 8, 2007 Ex.* 1 at 2-3 (*Rolfe Rpt.*). Deputy Rolfe knew that Mr. McCurdy had been taken into custody, so the likelihood of violence at the McCurdy residence was reduced. Nevertheless, Deputy Rolfe testified that domestic violence disturbances are often volatile. *Feb. 8, 2007 Tr.* 12:5-10. The officer's concern is enhanced whenever he is aware that there is a weapon and this concern extends not just to the perpetrator, but also to the

---

DiBonaventuro telephone call, he described the case as silver, *Gov't Sept. 16, 2008 Ex.* 2 (*DiBonaventuro Notes: Huckins*); in court, he described the case as black. But, the Government has not placed the gun case or photographs of the gun case into evidence and without actually seeing the case, it is difficult to assess the significance of this disparity. The case could have been silvery black.

possibility that the victim may become an aggressor. *Id.* 12:5-15. Deputy Rolfe later testified that once inside the McCurdy home, he secured the premises to assure safety and continuity of evidence.

In this context, Mr. Huckins' testimony about packing and/or removal of Mr. Cheney's furniture and personal items is contradictory. Mr. Huckins testified on direct that after he entered the premises, while Deputy Rolfe was still completing his investigation, he and Mr. Cheney went into the bedroom and began to disassemble a bed. On cross-examination, he said that Mr. Cheney spoke with Deputy Rolfe while he and his father disassembled the bed. Similarly, it is difficult to determine whether Mr. Huckins actually removed items from the McCurdy home during the search: on cross-examination, he implies that he removed three loads of Mr. Cheney's items while the deputies were there; on re-direct, he recalled that he had not made any such trips before Deputy Rolfe emerged from the attic with the gun case.

From the Court's perspective, any permutation of the sequence as testified to by Mr. Huckins is incredible. During an ongoing police investigation and before a firearm was located, Mr. Huckins recalls that the deputy allowed Mr. Huckins and his father or Mr. Cheney to enter into a portion of the residence and begin disassembling furniture. It stretches credulity to conclude that a law enforcement officer would allow a third party to enter into a house where there is an ongoing criminal investigation, which includes a report of a firearm, and as the officer searches for the weapon, he permits the third party to rummage around, move and disassemble furniture, and pack personal items with the intention of hauling them away. This is supposed to have taken place even though the officer did not know where the firearm was located, whether there was more than one firearm, the type of firearm, and whether the firearm was loaded. The Court is dubious.

### C. Summary

The Court finds that the Government has proven it is more likely than not Ms. Sawtelle consented to the search of the attic and the seizure of the military harness and rifle case. The Court bases its finding on its assessment of the credibility of the witnesses, including Deputy Rolfe and Mr. Huckins. The Court readily concedes that Mr. Huckins' motivations and recollections remain a mystery, and there are some indicia of reliability. But, these indicia are outweighed by unexplained contradictions with other evidence and a striking implausibility when Mr. Huckins' testimony is held up against the broader context of the domestic violence complaint, the sequence of events, and common sense police procedure.

On balance, the Court finds that Deputy Rolfe's version of the events, including Ms. Sawtelle's acquiescence to the search, is more likely than not.

## III. CONCLUSION

The Court AFFIRMS its denial of the Defendant's Motion to Suppress (Docket # 11).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 13th day of November, 2008