UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:06-cr-00080-JAW |
| | ) | |
| MARK MCCURDY | ) | |

**ORDER DENYING DEFENDANT'S MOTIONS FOR
NEW TRIAL, DISCOVERY, AND PRODUCTION**

On December 31, 2008, after a three-day trial, a jury found Mark McCurdy guilty of being a felon in possession of a firearm, a violation of 18 U.S.C. § 922(g)(1). *Jury Verdict Form* (Docket # 148); *Indictment* (Docket # 1). Following the verdict, Mr. McCurdy moved for a new trial and appealed the verdict; the motion and appeal were denied. *Def.'s Pro Se Mot. for New Trial* (Docket # 155); *Order Denying Mot. for New Trial* (Docket # 188); *Notice of Appeal* (Docket # 197); *J. of United States Court of Appeals* at 1-2 (Docket # 218).

Mr. McCurdy has filed three additional motions. First, on April 8, 2011, Mr. McCurdy moved again for a new trial based on newly discovered evidence, which he says discredits the testimony of Stephen John Cheney, a witness the Government called in its case-in-chief. *Def.'s Pro Se Mot. for New Trial* (Docket # 224) (*Def.'s Mot. for New Trial II*). Mr. McCurdy asks for an evidentiary hearing to present what he terms "irrefutable evidence" of Mr. Cheney's perjury and the prosecutor's knowing presentation of this perjured evidence. *Id.* at 10. Second, on April 22,

2011, Mr. McCurdy requested an order requiring the Government to produce materials that allegedly support his motion for new trial. *Def.'s* Pro Se *Mot. for Disc. of Materials Related to Elec. Surveillance of Def.* (Docket # 227) (*Def.'s Mot. for Disc.*). The final motion, also filed on April 22, 2011, asks the Court to order the Government to produce documents relating to the grand jury proceedings that resulted in his indictment. *Def.'s* Pro Se *Mot. for Produc. of Docs.* (Docket # 228) (*Def.'s Mot. for Produc.*).

## I.    BACKGROUND

### A.    Indictment, Plea, and Withdrawal of Plea

The November 15, 2006 indictment charged Mr. McCurdy with knowing possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1). *Indictment*. In his initial appearance before the Magistrate Judge on December 11, 2006, Mr. McCurdy entered a plea of not guilty. *Minute Entry* (Docket # 8). He later pleaded guilty to being a felon in possession of a firearm. *Minute Entry* (Docket # 57). At the Rule 11 proceeding, the Court informed Mr. McCurdy that his maximum exposure for incarceration was ten years; however, upon the completion of the Presentence Report, the Court learned that Mr. McCurdy had a criminal history that could trigger Armed Career Criminal status and subject him to a mandatory minimum prison term of 15 years under 18 U.S.C. § 924(e) and that the maximum term of imprisonment was not ten years, but life. *Order Granting Mot. to Withdraw Guilty Plea* (Docket # 74). This news prompted Mr. McCurdy to move to withdraw

his guilty plea, which the Court granted on May 2, 2008. *Id.*; *Def.'s Mot. to Withdraw Plea* (Docket # 73).

## B. The Trial

### 1. Testimony of Steven Smith and Janelle Hayward

A three day jury trial began on December 29, 2009. *Minute Entry* (Docket # 144); *Minute Entry* (Docket # 146); *Minute Entry* (Docket # 147). In its case-in-chief, the Government called seven witnesses. *Redacted Tr., Trial Proceedings, Volume II of III* at 2-3 (Docket # 217) (*Tr. II*). In the order denying the first motion for new trial, the Court outlined the Government's case-in-chief:

> [T]he Government introduced the testimony of Steven Smith, a federally-licensed firearms dealer and proprietor of Smitty's Trading Post in Machias, Maine, and Janelle Hayward, Mr. McCurdy's former girlfriend, regarding Ms. Hayward's purchase of a firearm from Smitty's on July 14, 2000. The Government also introduced a copy of an ATF Form 4473, signed by Ms. Hayward and Mr. Smith, dated July 14, 2000, documenting Ms. Hayward's purchase from Mr. Smith of a Colt Match Target HBAR .223 caliber rifle bearing serial number CMH037251. Ms. Hayward testified that Mr. McCurdy asked her to purchase the gun for him. Finally, the Government introduced as Government's Exhibit 2 a Colt Match HBAR .223 caliber rifle bearing serial number CMH037251 through the testimony of Deputy Jonathan Rolfe of the Washington County Sheriff's Department. Deputy Rolfe explained that he discovered and seized that firearm from Mr. McCurdy's attic on March 27, 2006.
>
> The Government asked Mr. Smith and Ms. Hayward questions designed to link the firearm Mr. Smith sold to Ms. Hayward on July 14, 2000 to Government Exhibit 2, the firearm Deputy Rolfe found in the Defendant's attic on March 27, 2006. Both witnesses linked Government Exhibit 2 to the sale.

*Order Denying Mot. for New Trial* at 1-2.

## 2. Testimony of Stephen John Cheney, Jr.

Stephen John Cheney, Jr.[1] testified for the government. Mr. Cheney's mother, Paula Sawtelle, was Mr. McCurdy's girlfriend as of March 27, 2006. Mr. Cheney testified, among other things, about an altercation between Mr. McCurdy and Ms. Sawtelle that resulted in police being called to Mr. McCurdy's residence. *Tr. I* at 206:8-207:25. According to Mr. Cheney, after coming upon the altercation between his mother and Mr. McCurdy, he confronted Mr. McCurdy and a fight ensued. *Id.* at 207:23-210:13. After Mr. McCurdy left the residence, police arrived, and Mr. Cheney testified that he told the officer a weapon was in the attic of the house.[2] *Id.* at 210:14-211:13. He stated that the gun belonged to Mr. McCurdy and he had seen the gun before. *Tr. I* at 211:14-212:2; *Tr. II* at 6:7-12:17. Mr. Cheney also linked the gun's case to Mr. McCurdy. *Tr. I* at 213:6-22; *Tr. II* at 6:7-12:17.

On cross-examination, Mr. Cheney admitted to telephoning Mr. McCurdy after arriving in Bangor to testify in the trial.[3] *Tr. II* at 46:12-47:6. Defense counsel, Jeffrey Silverstein, questioned Mr. Cheney about the purpose and content of these calls:

Q. You were looking to acquire something from him, weren't you?

A. Acquire, what do you mean?

. . . .

---

[1] Mr. Cheney's full name is mistakenly listed as "Stephen James Cheney, Jr." in parts of the trial transcripts, but he testified upon taking the stand that his middle name is John. *Redacted Tr., Trial Proceedings, Volume I of III* at 201:1-4 (Docket # 216) (*Tr. I*). Mr. Cheney goes by "John." *Tr. I* at 201:1-4.

[2] When asked how he knew the gun was in the attic, Mr. Cheney responded, "My mother said so – well told me it was there for sure." *Id.* at 211:15-16.

[3] At the time of trial, Mr. Cheney lived in Florida. *Tr. I* at 201:11-12.

Q. Get something from him?

A. No.

Q. Really?  You didn't call him to ask if someone could stop by to pick something up?

A. He said he was going to give me a Christmas card for my daughter that he missed.

. . . .

Q. Okay.  And did you not imply to him that because you weren't capable of getting something from him that you were going to take care of business here in court today?

A. Take care of business?

Q. Yeah.

A. I don't understand.

Q. Did you imply that it would affect your testimony?

A. Affect my testimony, no.

. . . .

Q. Didn't you tell Mark because he didn't have something for you that the deal was off, so to speak?

A. Explain.  I don't understand the –

Q. You called him on the phone?

A. I spoke with Mark.

Q. You asked if you could send someone by?

A. No.  I – my friend was coming to pick me up.

Q. Yeah.  And you said, I will have a friend come by, correct?

A. Those could have been the words.

Q. All right. And he says, I can't have any contact with you?

A. No, he said with any convicted felons because he's on house arrest or something.

Q. Right. And that's you, right?

A. Well –

Q. In any event, and then you called later again, correct?

A. I may have. I don't –

Q. And he says, I have nothing for you, correct?

A. I don't know.

Q. You don't remember?

A. No, I don't.

Q. And you said, well, then the deal's off?

    . . . .

A. I didn't know we had a deal going.

*Tr. II* at 47:24-50:6. After this exchange, Mr. Silverstein explained at sidebar that Mr. McCurdy tape-recorded the disputed phone conversations with Mr. Cheney. *Id.* at 50:13-15. Mr. Silverstein acknowledged that Assistant United States Attorney (AUSA) Joel Casey had not heard the tapes but offered "to share them with him and the Court, if necessary, before [] seek[ing] to make use of them." *Id.* at 50:16-19. AUSA Casey responded, "This is all news to me, your Honor." *Id.* at 50:20. The Court recessed to allow defense counsel to play the tape for AUSA Casey. *Id.* at 51:11-52:10.

When the Court returned, counsel agreed to play the tape for the Court out of the presence of the jury. *Id.* at 52:12-24. After listening to the tape, the Court ruled that its admissibility would depend upon Mr. Cheney identifying his voice on the recordings, thereby authenticating the tape. *Id.* at 55:3-56:8. In discussing the authentication process, the Court and AUSA Casey had the following exchange:

> THE COURT: I understand your point [regarding concerns around authenticating the tape]. I mean, you [Mr. Casey] will have an opportunity to cross-examine [Mr. Cheney] and you can find out what he makes of the whole thing, whether he does identify that as a conversation that he had with the defendant and look, I don't know exactly what they're talking about but –
>
> MR. CASEY: I got a pretty good idea, sorry, Your Honor.
>
> THE COURT: Well, maybe you do. I don't. If, in fact – I think one interpretation of it could be that he was willing to alter his testimony if they came to an agreement, some form of agreement. And if that's the spin that the defendant places on it, I think it's certainly extremely probative. So my sense is that it gets in and you can argue whatever you can argue concerning the gap, but let's find out what he has to say about it.

*Id.* at 57:7-23.

Still outside the presence of the jury, defense counsel played the tape for Mr. Cheney and the Court allowed Mr. Silverstein to explore the tape-recorded conversation with Mr. Cheney. *Id.* at 58:8-60:18. While identifying his voice in the first taped conversation, Mr. Cheney initially only admitted that "[i]t may have been" his voice in the second recording. *Id.* at 60:8-15. AUSA Casey then questioned Mr. Cheney:

> Q. [Y]ou understand that it's a federal crime to commit perjury?

7

A. Yes.

    . . . .

Q. . . . . And so I want to be absolutely clear with you, Mr. Cheney, that you need to be honest in responding not only to Mr. Silverstein's questions, but my own, and any inquiries by the Court; do you understand that?

A. Yes.

Q. Was it your voice on both of those calls?

A. Yes.

    . . . .

Q. Now, on that tape, you said, do we have an agreement or no. During the second call you said, do we have an agreement or no. Do you remember – do you remember that?

A. Yes.

Q. What were you referring to?

A. My friend to stop by to pick it up. He is a felon and [Mr. McCurdy] didn't want no one there.

Q. To pick what up?

A. He said he had presents, he said, and he had them. Then he said, he didn't have them. So I sent a guy to pick them up . . . .

Q. Well, Mr. Cheney, during that second call when you said, do we have an agreement or no, Mr. McCurdy then says, the truth is the truth, do you want to play that call again?

A. I know what it says, but I think there is a skip in the tape.

Q. Mr. Cheney, I am going to ask you a question and you need to tell the truth.

A. Okay.

> Q. Prior to coming here to Maine to testify, did you and Mr. McCurdy have any discussions about the substance of your testimony and how you will testify here at trial?
>
> A. No, no.
>
> Q. And when you referred to – when you asked Mr. Cheney, you got what I need, what were you referring to, what did you need?
>
> A. The gifts for my daughter.

*Id.* at 61:2-63:13. After the voir dire examination, Mr. Silverstein explained he would ask follow-up questions to Mr. Cheney regarding the phone conversations. *Id.* at 64:9-10. Defense counsel stated that "[if] the witness is not straight, then we may need to play the tape." *Id.* at 64:10-12.

The jury was brought back into the courtroom and both Mr. Silverstein and AUSA Casey questioned Mr. Cheney about his conversation with Mr. McCurdy. *Id.* at 64:16-66:7, 69:22-73:5. On questioning by Mr. Silverstein, Mr. Cheney maintained that the phone conversations referred to a "Christmas present" for his daughter. *Id.* at 65:7. In response to AUSA Casey's redirect examination, Mr. Cheney acknowledged that he had not told the Government about his phone conversations with Mr. McCurdy until his testimony that morning in court. *Id.* at 71:4-72:2. Neither Mr. Silverstein nor AUSA Casey played the taped phone conversations to the jury.

## C. The First Call From Florida

In his affidavit filed on April 8, 2011, Mr. McCurdy explains that after a Probation Officer accused him in June 2008 of leaving the state of Maine without permission, he "routinely recorded telephone calls to and from [his] residence." *Aff.*

*of Mark McCurdy in Support of Mot. for New Trial* ¶ 2 (Docket # 225) (*McCurdy Aff.*). He said he used two recording systems: one that "was supposed to record calls at the touch of a button, but didn't always capture the conversations" and a second "manual system consisting of a hand held recorder and a suction cup style microphone . . . ." *Id.* ¶ 5. He indicated that the latter system "occasionally failed in the middle of a conversation." *Id.* He gave "some" of the tape recordings to Mr. Silverstein "for safekeeping." *Id.* ¶ 6.

> Mr. McCurdy then explains the hidden meaning of "Christmas present":
>
> John Cheney wanted me to give him a thousand greens (approx. $100,000 US Dollars in Oxycontin) for him to tell the truth. That was the reason he was so upset in Call #1 (from Florida) that he didn't receive the Christmas card that was supposed to save me. That was why he stated in Call #2 (from Bangor) that he was sending someone by to pick up the Oxycontins. And why in Call #3 (Whiting) that he would stop by and pick up the Oxycontins himself. When I told John Cheney "the truth doesn't change" and he finally realized that I was not going to give him illegal drugs in order for him to tell the truth he stated: "I'm going to f**k you, you'll find out what the f*****g truth is when I test[i]fy."

*Id.* ¶ 8. On Sunday, December 28, 2009, the very eve of trial, Mr. McCurdy says that he reviewed "the tape recordings that [he] had at [his] disposal for evidence of John Cheney's extortion of [him]." *Id.* ¶ 10. He states that "[t]he only two recordings that I found were of the call from Bangor upon [Mr. Cheney's] arrival and the call from Whiting the night he stole my boat." *Id.* Mr. McCurdy says that he "presented both of these recordings to the Court." *Id.*

Mr. McCurdy continues, stating that in January 2011 he asked his brother to "check the safe and see if any tape recordings of John Cheney still existed. He told

me that there was one tape with two recordings on it. These being the recordings that were already presented to the Court." *Id.* ¶ 11. In late February 2011, Mr. McCurdy asked Amanda Prescott "if she would pick up some tape recordings from my brother and review them to see if there was any evidence of Cheney's extortion of me on them." *Id.* ¶ 12.

Finally, Mr. McCurdy asserts that on March 5, 2011 Ms. Prescott sent him an email in which she mentioned a McCurdy-Cheney conversation about "a Christmas card to save yourself." *Id.* ¶ 13. Mr. McCurdy states that he thought she was referring to one of the taped conversations already presented to the Court. *Id.* However, upon further investigation, it turned out that Ms. Prescott had located a different tape on which Mr. McCurdy captured the first McCurdy-Cheney telephone conversation. *Id.* ¶ 14.

On March 5, 2011, Mr. McCurdy emailed Ms. Prescott and told her what he thought the tape of the first conversation should reveal. *Id.* Attach. 1 (Email from Mark McCurdy to Amanda Prescott (Mar. 5, 2011)). Ms. Prescott responded the next day in an email:

> [I] told u what was there and u answered ur own ? about why he is so evasive about xmas presents because not once did he mention them or his kid whose name I do not know either.the first call (from florida) said "no xmas card from ya, a xmas card to save yourself".then goes on to say his mom got served for u and he is for prosec crazy,crazy he says.then says he going to be in tom do u want him to stop by and u sure and "whatever is going to happen",u said "what do u mean?" he says,"what we talked about before, everything all good?" u said,"no" and talked about not being able to go anywhere.he said"how far can u go?" u said u were going to the law libary (next day) he said ill swing by tomorrow.

*Id.* Attach. 2 (Email from Amanda Prescott to Mark McCurdy (Mar. 6, 2011))

(*Prescott Email*). Ms. Prescott describes a second call, presumably from Bangor:

> then he called and said he was in.u said when did u get in. he said
> couple hrs ago. u say where do they have u he says out by the mall. u
> says their [sic] going to keep an eye on u and he said prob so.u says we
> cant have contact and cant have contact with anyone known to b a
> felon, he says "I have a boy swinging by" u say "he aint a felon is he if
> he is i cant have anything to do w him" he said no not for about six
> years now...(something after mumble) "he is  just stopping by to grab
> whatever...ur okay w that?right? u say"i wil [sic] talk with him"he
> says"u got what i need?" u say"nope"  he says"no!?" u said "no". he
> says"what do u mean?" u starting saying about just being at law
> lib.and cant go anywhere.he says when can ya? u say cant leave now
> till mon. he says i don't know what to tell ya then." u say "oh well"  he
> said "alright then." u sayill [sic] talk to ya later.end.

*Id.*

Ms. Prescott recites the content of a third taped telephone call. This time Ms.

Prescott says Mr. Cheney was in Whiting, Maine:

> asked what u were doing and u said watch ing a movie. he says"im
> close figured id call and see what ur doing" u said doing paperwork for
> mon.he say mon? do..do we have an agreement or no? u said"do we
> have an agreement?" he says"u know what i am saying" u say "he the
> truth doesnt change" he says "u know what im saying, well, I don't
> know what to tell ya though" u said"u cant be playing both sides and
> the middle with the feds" he says "im not playing...(then the tape cut
> out and in)..u say"what do you mean?" he says"you know" u said"no i
> dont know" he said"well, oh well then" u said 'alright" and hang up.

*Id.*

### D.    The Motions Before the Court

#### 1.    Motion for New Trial

On April 8, 2011, Mr. McCurdy moved for a new trial and for an evidentiary

hearing on this motion, claiming newly discovered evidence. *Mot. for New Trial II*.

He asserts that "[d]espite due diligence" he was "ignorant of and unable to produce

certain crucial evidence at trial." *Mot. for New Trial II* at ¶ 1. Specifically, he claims to have been "taken aback when he learned on March 6, 2011 that there was a recording of the original phone call from Florida in which Cheney demands to know why McCurdy didn't send him a Christmas card, a Christmas card that would save McCurdy."[4] *Id.* ¶ 4. According to Mr. McCurdy, this undiscovered recording proves Mr. Cheney committed perjury. *Id.* ¶¶ 6, 7, 9. Mr. McCurdy argues that the recording is material, and "not merely cumulative," because Mr. Cheney acted as the "star government witness" or "'make or break' witness" and "was the only witness who placed the firearm in McCurdy's possession within the statute of limitations . . . ." *Id.* ¶ 8. Furthermore, Mr. McCurdy claims AUSA Casey "knew or should have known that Cheney was lying," *id.* at ¶ 7, and, therefore, "sub[]orned this perjury in violation of 18 U.S.C. § 1622." *Id.* at ¶ 10.[5]

In response, the Government emphasizes that at trial the defense did not choose to play the available recordings for the jury and that "Cheney testified about the 'Christmas card' conversation that McCurdy now cites as newly discovered evidence." *Gov't's Resp. to Def.'s Mot. for New Trial* at 3 (Docket # 233) (*Gov't's Resp. to Mot. for New Trial*). The Government says:

> The defendant cannot plausibly maintain that a conversation that *he* had with a Government witness shortly before trial that *he* recorded,

---

[4] Mr. McCurdy admits that he "knew that he had the conversation [constituting the allegedly newly discovered evidence] with Cheney in which a Christmas card is demanded from McCurdy so that McCurdy can save himself." *Def.'s Reply to Gov't's Resp. to Mot. for New Trial* ¶ 2 (Docket # 234) (*Def.'s Reply Mot. for New Trial*). However, Mr. McCurdy asserts that "[i]n the absence of 'irrefutable' tape recorded evidence, it would have been futile to pursue Cheney's extortion of McCurdy, especially after the 'Christmas Present' story." *Id.*

[5] Section 1622 states, "Whoever procures another to commit any perjury is guilty of subornation of perjury, and shall be fined under this title or imprisoned not more than five years, or both." 18 U.S.C. § 1622.

that *he* had an opportunity to question the witness about at trial and that the witness testified about at trial constitutes evidence that was unknown or unavailable to him.

*Id.* (emphasis in original).[6]  According to the Government, if the Court does find that Mr. McCurdy was unaware and unable to produce the Florida conversation recording, the motion for new trial should still be denied because "[e]ven if the jury completely discounted the testimony of Cheney, there was proof beyond a reasonable doubt that the defendant possessed the firearm in his home."[7]  *Id.* at 5. Finally, the Government denies the accusation that the prosecution suborned perjury from Mr. Cheney, stating that "[t]he trial record and the defendant's affidavit offer no support for it."[8]  *Id.*

### 2.    Motion for Discovery

On April 22, 2011, Mr. McCurdy asked the Court "in further support of his motion for new trial [to order] the United States Probation Office, a member of the prosecution team, to turn over . . . their tape recordings of the [listed] telephone

---

[6] The Government also argues that Mr. Cheney failed to exercise due diligence in locating the recording prior to trial and, "[i]n any event, the defendant could have asked for a continuance of the trial to allow for further review of the recordings."  *Gov't's Resp. to Mot. for New Trial* at 4.  In reply, Mr. McCurdy asserts that "[i]t would have been impossible to ask the Court for a continuance of five weeks (200 hours of tapes divided by 40 hours/week = 5 weeks) to listen for recordings of Cheney's extortion of McCurdy that the Defendant did not believe existed."  *Def.'s Reply Mot. for New Trial* ¶ 3.

[7] In support of its contention that sufficient evidence existed to convict Mr. McCurdy absent Mr. Cheney's testimony, the Government refers to testimony by Deputy Rolfe, Ms. Hayward, and Mr. Smith as well as the fact that the "firearm . . . was found in the attic of [Mr. McCurdy's] own home."  *Gov't's Resp. to Mot. for New Trial* at 5.

[8] The Government argues that "the record supports the conclusion that it was defense counsel who first drew out testimony by Cheney about conversations that he had with the defendant while he (Cheney) was in Florida" and that "Cheney testified that prior to disclosing these conversations during his trial testimony he had never told the Government that he had spoken with the defendant by telephone while in Maine or while in Florida."  *Id.*  Therefore, the Government concludes that "[a]ssuming, *arguendo*, that Cheney's testimony about the conversations was false, the Government cannot be said to have suborned perjury where it only learned of the conversations for the first time during trial."  *Id.*

calls and associated exculpatory material." *Def.'s Mot. for Disc.* at 1.[9]  Mr. McCurdy asserts that a federal probation officer told him that "the U.S. Probation Office would regularly monitor his calls to insure he complied with his bail conditions." *Id.* ¶ 8.  He claims that "[t]he requested recordings are in the custody of the United States Probation office." *Id.* ¶ 2.  Mr. McCurdy alleges that the actions of Wade Maddox, a United States Probation Officer, "made the . . . Probation Office part of the prosecution team and any exculpatory material held by any member of the prosecution team is discoverable."[10] *Id.* ¶ 7.  Finally, Mr. McCurdy asserts:

> On September 16, 2008, [he] was told that the recorded conversation that he had with defense witness, Scott Huckins, on 9/15/08 had been reviewed and the information gleaned was used by AUSA Joel Casey in his cross examination of Huckins.

*Id.* ¶ 9. [11]

In response, the Government states flatly that "[t]he alleged recordings were never made." *Gov't's Resp. to Def.'s Mot. for Disc. of Materials Related to Elec. Surveillance of the Def.* at 1 (Docket # 232) (*Gov't's Resp. to Mot. for Disc.*).  As evidence supporting the nonexistence of the recordings, the Government explains:

---

[9] Mr. McCurdy asserts that the Probation Office recorded his phone conversations with Mr. Cheney and Scott Huckins and he demands copies of the recordings.  *Def.'s Mot. for Disc.* at 2.  The Motion also seeks "[a]ny and all orders issued by any court authorizing electronic surveillance of the Defendant," "[a] copy of the agreement between the United States Probation Office and McCurdy concerning the Home Monitoring System," and "[a] description of all the materials resulting from the phone monitoring and any and all recorded statements of the Defendant obtained by way of surveillance that are in any way related or material to the charged offense." *Id.*

[10] Mr. McCurdy alleges that Mr. Maddox became a member of the prosecution team when he attended "plea negotiations with McCurdy" and "called in several U.S. Marshalls to secure the courtroom while [checking] to see if McCurdy had somehow violated his bail conditions by recording telephone calls [with] Cheney." *Def.'s Mot. for Disc.* ¶ 5-6.

[11] Scott Huckins testified for the defense in the suppression hearing held in response to Defendant's motion to prevent the Government from introducing the gun, gun case, and rucksack containing firearms and ammunition discovered by police in Mr. McCurdy's attic.  *Redacted Tr., Motion to Suppress Proceedings* at 8-58 (Docket # 214); *Def.'s. Mot. to Suppress* (Docket # 11).  The Court denied the Motion to Suppress.  *Order Denying Def.'s Mot. to Suppress* (Docket # 30).

> Supervisory U.S. Probation Office[r] Julie Morse reports that the monitoring equipment used by the U.S. Probation Office to enforce a home detention bail condition does not allow for the recording of wire communications to and from the defendant's home.

*Id.* Because the recordings never existed, the Government does not address Mr. McCurdy's other arguments. *Id.*

### 3. Motion for Production of Documents

On April 22, 2011, Mr. McCurdy filed a second motion requesting the Government produce documents related to his grand jury indictment. FED. R. CRIM. P. 26.2; *Def.'s Mot. for Produc.* The motion seeks the production of Jencks Act, 18 U.S.C. § 3500, material including a list of witnesses who testified at the grand jury proceedings that resulted in Mr. McCurdy's indictment, Mr. Cheney's June 7, 2006 grand jury testimony, and "[a]ny statement by any witness used by the prosecution and presented to the grand jury . . . ."[12] *Id.* at 1-2.

The Government filed a terse response on May 2, 2011, asserting that Mr. McCurdy is not entitled to the material he requests and that the Government already provided his trial counsel with the required materials. *Gov't's Resp. to Def.'s Mot. for Produc. of Docs. under Jencks Act* (Docket # 231) (*Gov't's Resp. to Mot.*

---

[12] The relevant portion of the Jencks Act states:

> After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

18 U.S.C. § 3500(b).

*for Produc.*).  In response to a Court order, *Order for Supp. Resp.* (Docket #242), the Government supplemented its argument clarifying that: (1) "it provided defense counsel with all discovery and Jencks Act materials in this case"; (2) the defendant bears the "initial burden to prove that a Jencks Act statement exists and was not produced to him in accordance with the Act;" and (3) Mr. McCurdy failed to carry that burden.  *Gov't Resp. to Ct.'s Order for Supp. Resp.* at 2-3. (Docket # 243) (*Gov't Supp. Resp.*).    Four copies of discovery letters attached to the supplementary response document correspondence between AUSA Casey and Mr. Silverstein concerning the Government's disclosure of grand jury testimony and Jencks Act materials.  *Id.* Attach. 1 (transcript of Paula Sawtelle's grand jury testimony), Attach. 2 (additional discovery material), Attach. 3 (124 pages of Jencks Act materials), Attach. 4 (additional discovery material); *see also Gov't's Sur-Reply to Def.'s Mot. for Produc. of Docs. under Jencks Act* at 1 (Docket # 237) (stating that "Mr. Cheney's testimony was provided to defense counsel on about November 21, 2008"); *id.* Attach. 1 at 2 (copy of transcript cover page of Mr. Cheney's grand jury testimony provided to defense counsel); *Gov't's Supp. to Sur-Reply to Def.'s Mot. for Produc. of Docs. under Jencks Act* (Docket # 239) (*Gov't's Supp. to Sur-Reply*); *id.* Attach. 1 (Email from Jeffrey Silverstein to Joel Casey dated Jun. 10, 2011) (confirming that defense counsel "found Chen[e]y's GJ [grand jury] testimony so have sent [Mr. McCurdy] a copy direct") (*Silverstein Email*).

## II.    DISCUSSION

### A.    Motion for New Trial

### 1. Request for Evidentiary Hearing

In his motion for new trial, Mr. McCurdy requests that the Court hold an evidentiary hearing. *Def.'s Mot. for New Trial II* at 1, 11. Evidentiary hearings for new trial motions "are the exception, not the rule." *United States v. Alicea*, 205 F.3d 480, 487 (1st Cir. 2000); *see also United States v. Connolly*, 504 F.3d 206, 220 (1st Cir. 2007). Normally, "[s]uch motions . . . are decided on the basis of affidavits, without convening evidentiary hearings." *Connolly*, 504 F.3d at 220. In determining whether to grant an evidentiary hearing, "the court must make a practical, commonsense evaluation." *Id.* at 219. Otherwise, an evidentiary hearing on cumulative evidence lacking sufficient probability to change or affect a jury verdict would simply be superfluous. *See, e.g., Connolly*, 504 F.3d at 219-20 (quoting *United States v. Carbone*, 880 F.2d 1500, 1502 (1st Cir. 1989)). In *United States v. González-González*, the First Circuit affirmed the district court's denial of a defendant's request for an evidentiary hearing concerning the veracity of witnesses' testimony because "ample evidence support[ed] the jury's verdict" and therefore the defendant "had failed to show that the alleged new evidence of perjury . . . warrant[ed] a new trial." 258 F.3d 16, 23-24 (1st Cir. 2001).

Because Mr. McCurdy offers merely "cumulative impeachment evidence," *Barrett*, 965 F.2d at 1192-93 (citing *Bagley*, 473 U.S. at 678), outweighed by the "ample evidence support[ing] the jury verdict," he has "failed to show that the alleged new evidence of perjury . . . warrants a new trial." *González-González*, 258

F.3d at 24. The Court denies Mr. McCurdy's motion for an evidentiary hearing in support of his motion for a new trial.

### 2. Request for New Trial

#### a. Legal Standard

In Mr. McCurdy's first motion for a new trial alleging newly discovered evidence showing perjury by a government witness, the Court set forth the applicable standard:

> Federal Rule of Criminal Procedure 33(a) provides, in part, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." FED. R. CRIM. P. 33(a). In general, a "district court has greater power to order a new trial than to overturn a jury's verdict through a judgment of acquittal." *United States v. Rothrock*, 806 F.2d 318, 321 (1st Cir. 1986). On the other hand, there are "definite limits upon a district court's right to upset a jury verdict." *Id.* at 322. The First Circuit has explained that the "remedy of a new trial is rarely used; it is warranted 'only where there would be a miscarriage of justice' or 'where the evidence preponderates heavily against the verdict.'" *United States v. Andrade*, 94 F.3d 9, 14 (1st Cir. 1996) (quoting *United States v. Indelicato*, 611 F.2d 376, 386 (1st Cir. 1979)). The standards for a Rule 33 motion are rigorous, and "a trial judge is not a thirteenth juror who may set aside a verdict merely because he would have reached a different result." *Rothrock*, 806 F.2d at 322.

To succeed on a motion for new trial based on newly discovered evidence, the defendant must demonstrate:

> (i) the evidence upon which the defendant relies was unknown or unavailable to him at the time of trial; (ii) the failure to bring the evidence forward at trial was not occasioned by a lack of diligence on the defendant's part; (iii) the evidence is material (as opposed to being merely cumulative or impeaching); and (iv) the evidence is such that its introduction would probably result in an acquittal upon a retrial of the case.

> *United States v. Maldonado-Rivera*, 489 F.3d 60, 66 (1st Cir. 2007); *see United States v. Sepulveda*, 15 F.3d 1216, 1220 (1st Cir. 1993) (clarifying that the evidence "must create an actual probability that an acquittal would have resulted if the evidence had been available").

*Order Denying Mot. for New Trial* at 5-6. To succeed on a new trial motion, the defendant must establish all four prongs of this test, commonly referred to as the *Wright* test. *See, e.g., Connolly*, 504 F.3d at 212 ("Every element of this test . . . is essential, and a failure to establish any one element will defeat the motion."); *see also United States v. Wright*, 625 F.2d 1017, 1019 (1st Cir. 1980).

A modified test applies if the defendant advances a colorable claim that the Government knowingly used perjured testimony.[13] *González-González*, 258 F.3d at 22. The modified test, sometimes referred to as the *Kyles v. Whitley* standard, applies "[d]ifferent standards as to the third and fourth [prongs]" of the *Wright* test. *Id.* at 20; *see also Kyles v. Whitley*, 514 U.S. 419, 434 (1995). Under this standard, the third and fourth prongs merge and the defendant must instead "show a 'reasonable probability' that had the evidence been disclosed to the defense the result of the proceeding would have been different." *Id.* (quoting *Kyles*, 514 U.S. at 434). The *Kyles* inquiry requires the Court to determine whether, despite the absence of such evidence, "the trial resulted . . . in a verdict worthy of confidence." *Id.* This more defendant-friendly standard applies *only after* the court finds that a colorable claim exists that "the government knowingly used perjured testimony." *Id.* at 22 n.1.

---

[13] In *United States v. González-González,* the First Circuit held that the prosecution's knowing use of perjured testimony should be treated the same as a *Brady* violation for purposes of a defendant's motion for a new trial. 258 F.3d 16, 20 (1st Cir. 2001).

The evidence does not support Mr. McCurdy's claim that the Government suborned perjury through Mr. Cheney's testimony. Mr. McCurdy argues that AUSA Casey "elicited perjury" from Mr. Cheney regarding the "'Christmas Present' story" and "did nothing to correct it and set the record straight." *Def.'s Mot. for New Trial II* at 10.

First, Mr. McCurdy incorrectly accuses the Government of eliciting testimony about the "Christmas present" story. *Id.* The first mention of the Christmas present[14] came not during AUSA Casey's questioning but during defense counsel's

---

[14] In his testimony, Mr. Cheney refers to both a "Christmas card" and a "present" that he alleges constituted the subject of his recorded phone calls with Mr. McCurdy. On cross-examination, Mr. Cheney initially claimed to have called Mr. McCurdy prior to the trial because "[Mr. McCurdy] said he was going to give [Mr. Cheney] a *Christmas card* for [Mr. Cheney's] daughter that he missed." *Tr. II* at 48:8-9 (emphasis added). On further questioning by Mr. Silverstein, Mr. Cheney testified, "[Mr. McCurdy] said, I – I wasn't sure if I was going to make it to town, to my home town, to give my son . . . a *present* so I asked if a friend could pick it up." *Id.* at 48:15-18 (emphasis added). During voir dire, the following exchange took place between AUSA Casey and Mr. Cheney:

> Q. And what did you talk about [when you called Mr. McCurdy from Florida]?
>
> A. Sending him a *Christmas card*. He is supposed to send me one. He even asked me what size my daughter was to send her clothes. That's what I was supposed to pick up. So this agreement is blown out of the water . . . .
>
> Q. Now, on that tape [played for the Court during recess and for Mr. Cheney during voir dire], you said, do we have an agreement or no. During the second call you said, do we have an agreement or no. Do you remember – do you remember that?
>
> A. Yes.
>
> Q. What were you referring to?
>
> A. My friend to stop by to pick it up . . . .
>
> Q. To pick what up?
>
> A. He said he had *presents*, he said, and he had them. Then he said, he didn't have them . . . .

*Id.* at 62:2-18 (emphasis added). On redirect examination with the jury present, AUSA Casey asked Mr. Cheney, "Have you had discussions with Mr. McCurdy during these phone conversations about getting something from him?" *Id.* at 72:18-19. Mr. Cheney responded, "Yes." *Id.* at 72:20. When

cross-examination of Mr. Cheney.  *Tr. II* 48:6-9.  The defense, not the Government elicited testimony about the Christmas present conversations.

Second, Mr. McCurdy wrongly accuses AUSA Casey of doing "nothing to correct [Mr. Cheney's alleged perjury] and set the record straight."  *Def.'s Mot. for New Trial II* at 10.  Once the Christmas present story was revealed by Mr. Silverstein, Mr. Casey, in no uncertain terms, instructed Mr. Cheney about the need to be truthful.  Contrary to Mr. McCurdy's allegations, in Mr. Cheney's voir dire examination concerning the recorded telephone conversations introduced at trial, AUSA Casey impressed upon Mr. Cheney the importance of telling the truth and the seriousness of perjury.  *See Tr. II* at 60:24-61:11.  If Mr. Cheney lied, it was despite the prosecutor's efforts, not because of them.

Third, even if the Government had some doubts about Mr. Cheney's testimony regarding the phone conversations with Mr. McCurdy, on its face, the Christmas present story is plausible.  Mr. Cheney is the son of Mr. McCurdy's former girlfriend, Paula Sawtelle, and Mr. McCurdy and Ms. Sawtelle had been in a relationship for five or six years.  *Tr. I* at 202:10-24.  Mr. Cheney testified that he had lived at his mother's house and that he had an infant daughter.  *Id.* at 204:8-22.  Even though the relationship between Mr. McCurdy and Ms. Sawtelle and between Mr. McCurdy and Mr. Cheney was strained by the events of March 27, 2006, it is not illogical for Mr. McCurdy to retain affection for Mr. Cheney's daughter and to wish to send her a Christmas present.  At the same time, the Court acknowledges

---

asked what he expected to get from Mr. McCurdy, Mr. Cheney responded, "They was *Christmas gifts* for my daughter and a *card*, I guess, for the wife and me."  *Id.* at 72:22-23 (emphasis added).

that with trial fast approaching, Mr. Cheney and Mr. McCurdy seem unusually focused on this gift.

Fourth, if Mr. McCurdy knew that Mr. Cheney was speaking in code and referring to drugs when he talked about a "Christmas present" for his daughter, he could have alerted his defense lawyer to the significance of that phrase. Yet, Mr. McCurdy's counsel made no attempt to expose the allegedly true meaning of the phrase during trial; this current nefarious explanation emerged for the first time on April 8, 2011, more than two years after trial, when Mr. McCurdy filed an affidavit in support of his motion for new trial. *See supra* Part I.C.

Fifth, it was Mr. McCurdy who recorded his telephone conversations with Mr. Cheney and who failed to discover that his first conversation with Mr. Cheney had been taped. *McCurdy Aff.* ¶ 10-14. It is unclear how the Government should have discovered in Mr. McCurdy's tapes what he could not. *See, e.g., United States v. Bender,* 304 F.3d 161, 164 (1st Cir. 2002) ("Neither the relevant Supreme Court precedent under *Brady* nor [First Circuit precedent] requires a prosecutor to seek out and disclose exculpatory or impeaching material not in the government's possession.").

Sixth, the record reveals that the Government knew nothing about Mr. McCurdy recording telephone conversations until his defense lawyer revealed this fact in the middle of cross-examining Mr. Cheney. Mr. Silverstein acknowledged that the prosecutor was unaware of the recordings, *Tr. II* 50:16-19 ("Now, Mr. Casey hasn't heard them and I am certainly willing to share them with him and the Court,

if necessary, before I seek to make use of them"), and AUSA Casey was clearly taken by surprise, *id.* at 50:20 ("This is all news to me . . . ."); *Gov't's Resp. to Mot. for New Trial* at 5.

Seventh, on redirect examination, it was AUSA Casey who questioned Mr. Cheney closely about these calls and whether he was telling the truth about them.[15]

Eighth, the defense did not play any of the tape recorded conversations before the jury. *Id.* at 64:9-12. The defense may have made this strategic decision because the substance of the conversations was admitted through testimony. In any event, the defense never made the jury aware of the existence of the tapes.

Ninth, although Mr. McCurdy accuses the Government of direct knowledge of his conversations with Mr. Cheney and of taping all his conversations while he was out on bail, there is no direct evidence supporting this accusation and the Probation Office denies it. Mr. McCurdy asserts in his affidavit that "Brian Eggert, U.S. Probation Officer, told me on June 26, 2008 as he was installing the home monitoring system (ankle bracelet), that this system had the capability to record my telephone calls to insure [sic] that I complied with my bail conditions." *McCurdy Aff.* ¶ 3. Mr. McCurdy then asserts: "I believe that the United States Probation Office can verify with their own recordings the content of my recordings." *Id.* ¶ 4.

---

[15] AUSA Casey asked Mr. Cheney on redirect, "During any of these calls, whether you made the calls when you were in Florida or whether you made the calls when you were in Maine, during any of these calls, have you and Mr. McCurdy discussed the substance of your testimony here today?" *Tr. II* at 72:3-7. Mr. Cheney responded, "No." *Id.* at 72:8. Asked whether he "discussed . . . altering [his] testimony" with Mr. McCurdy, Mr. Cheney responded, "No." *Id.* at 72:9-11. Several questions followed where AUSA Casey pressed Mr. Cheney on whether he had in any way sought to extort Mr. McCurdy in exchange for favorable testimony. Mr. Cheney maintained that the recorded phone conversations referred to "Christmas gifts for [his] daughter and a card . . . for the wife and me." *Id.* at 72:22-23. This testimony took place before the jury.

In response, the Government represents that "[t]he alleged recordings were never made" and that "the monitoring equipment used by the U.S. Probation Office to enforce a home detention bail condition does not allow for the recording of wire communications to and from the defendant's home." *Gov't's Resp. to Mot. for Disc.* at 1. Even assuming Probation Officer Eggert told Mr. McCurdy that the Probation Office had the capacity to monitor and record his telephone conversations, this does not mean it was true; it may have been Officer Eggert's way of enforcing compliance with the conditions of release. Given the Probation Office's representation that it did not have the capacity to record Mr. McCurdy's conversations, the Court will not assume—without more—it did.

Finally, it is true that these conversations between a defendant and a central Government witness within days of trial are highly unusual. It is also unusual that Mr. McCurdy made no attempt to alert the federal authorities to Mr. Cheney's alleged extortion attempt. If Mr. Cheney was attempting to extort drugs from Mr. McCurdy, it is difficult to believe that the federal authorities would not have been interested, especially because the federal prosecutor was going to put Mr. Cheney on the stand and place his credibility on the line. As AUSA Casey's reaction confirmed, there is no evidence that the Government knew anything about Mr. McCurdy's current allegation of extortion prior to Mr. Cheney's cross-examination.

Against all of these points, Mr. McCurdy places much weight upon a single remark by AUSA Casey. After excusing the jury and allowing counsel to discuss the recordings the defense wished to offer into evidence, the Court and counsel listened

to the taped McCurdy-Cheney conversations. The Court expressed doubts as to what exactly the two men were talking about. AUSA Casey interjected, "I got a pretty good idea . . . ." *Tr. II* at 57:13. The Court replied, "Well maybe you do. I don't."[16] *Id.* at 57:15. Mr. McCurdy claims that AUSA Casey's response indicates that the Government: (1) knew all along about the first conversation between Mr. McCurdy and Mr. Cheney in which the "Christmas present" ruse was set up; (2) knew about the existence of a tape recording of this first conversation; (3) knew that Mr. McCurdy and Mr. Cheney were not talking about Christmas presents but about drugs; and (4) suborned perjury by allowing Mr. Cheney to testify to the contrary. This singular and ambiguous statement by AUSA Casey does not begin to support Mr. McCurdy's serious accusations.

Mr. McCurdy also argues that the Government "didn't even bother to investigate Cheney's extortion of McCurdy." *Def.'s Mot. for New Trial II* at 7. This argument fails as well. First, there is no evidence that the Government either knew or should have known of Mr. Cheney's alleged attempt to extort Mr. McCurdy. Second, it was Mr. McCurdy who had the conversations with Mr. Cheney and possessed the tape recordings. A prosecutor is not required to "seek out and disclose exculpatory or impeaching material not in the government's possession." *Bender*, 304 F.3d at 164; *see also Maldonado-Rivera*, 489 F.3d at 67 ("For *Brady* to operate [resulting in the more defendant-friendly new trial standard], the government not only must know about undisclosed evidence but also must have custody or control of

---

[16] After the tape was played out of the presence of the jury, the Court left open the possibility that the recording could be played to the jury, which was not done. *Tr. II* at 55:20-57:23.

that evidence."). Here, evidence of the recordings remained undisclosed until revealed at trial by Mr. McCurdy's counsel. Mr. McCurdy, not the Government, exercised custody and control of the tapes. First Circuit precedent does not obligate the Government to seek out exculpatory or impeaching evidence unknown to the Government and in the possession of the defendant. *Id.*

The Court concludes that the Government did not suborn perjury and, therefore, that the *Wright* test applies to Mr. McCurdy's motion for new trial.

### b. Application of the *Wright* Standard

To prevail on a Rule 33 motion on the basis of newly discovered evidence, Mr. McCurdy must show the following: (i) that his newly discovered evidence was "unknown or unavailable to [him] at the time of trial"; (ii) that his "failure to learn of the evidence was not due to a lack of diligence" on his part; (iii) that "the evidence is material, and not merely cumulative or impeaching"; and (iv) that introduction of the evidence would "probably result in an acquittal upon retrial" of the case. *Wright*, 625 F.2d at 1019; *see also Maldonado-Rivera*, 489 F.3d at 65-66.

### i. The Evidence Must Have Been Unknown or Unavailable to the Defendant at the Time of Trial

The first showing Mr. McCurdy must make, under the *Wright* test, is that his newly discovered evidence was unknown or unavailable to him at the time of his trial. *See* 625 F.2d at 1019. "Information surrounding a defendant's own conversations rarely qualifies as newly discovered evidence." *United States v. Falu-Gonzalez*, 205 F.3d 436, 443 (1st Cir. 2000) (citing *United States v. DeLuca*, 137 F.3d 24, 40 (1st Cir. 1998)); *see also United States v. Slade*, 980 F.2d 27, 29-30 (1st

Cir. 1992). Specifically, where a defendant himself participated in conversations with several people later claimed to constitute newly discovered evidence, the First Circuit observed that the defendant "must have known long before trial that the 'exculpatory' testimony these witnesses could provide would be essential to respond to the evidence against him." *United States v. Deluca*, 137 F.3d at 40; s*ee also United States v. García-Pastrana*, 584 F.3d 351, 390 (1st Cir. 2009) ("[I]f [the defendants'] claims of threats were true, then obviously they would have known about the threats during trial. Thus, their evidence cannot be 'newly discovered,' as they cannot claim that the threats were 'unknown or unavailable to [them] at the time of trial.'").

### A. This Evidence was Known to Mr. McCurdy at the Time of His Trial

Mr. McCurdy can hardly claim that he did not know about the Florida, Bangor, and Whiting telephone calls because he participated in them. Furthermore, if Mr. McCurdy's interpretation of the recorded exchanges with Mr. Cheney is correct, these conversations would be distinctly memorable. As Mr. McCurdy tells it now, Mr. Cheney contacted him at some point and demanded $100,000 in Oxycontin in exchange for exculpatory testimony. There is no indication that this conversation was ever recorded. While in Florida, just before coming to Maine, Mr. Cheney followed up by telephoning Mr. McCurdy and asking him about a Christmas card to save Mr. McCurdy. This phone call was allegedly recorded but the tape apparently went missing. After arriving in Maine, Mr. Cheney again contacted Mr. McCurdy from Bangor, saying that he would send

someone by to pick up the Christmas present. Finally, when Mr. Cheney was in Whiting, he asked Mr. McCurdy whether they had a deal. Mr. McCurdy produced at trial the tape recordings of the Bangor and Whiting conversations but not the Florida conversation.

As discussed above, Mr. McCurdy's participation in the phone conversations with Mr. Cheney undermines his claim that he was unaware of the Florida recording at the time of trial. Mr. McCurdy's affidavit does not list the dates, but it appears that the timing of these conversations was extremely close. Although exact timing is difficult to piece together, according to Ms. Prescott, during the McCurdy-Cheney Florida conversation, Mr. McCurdy stated that he would be "going to the law library (*next day*) . . . ." *Prescott Email* (emphasis added). Mr. Cheney responded to Mr. McCurdy, "ill swing by tomorrow." *Id.* It appears, therefore, that Mr. Cheney was arriving in Maine from Florida the next day. The next conversation—the Bangor conversation—presumably took place the next day because Mr. Cheney tells Mr. McCurdy that he had arrived just a couple of hours previously. When he testified, Mr. Cheney said that he arrived in Maine on Friday, December 26, 2008. *Tr. II at* 15:15-22. This means that the recorded Florida conversation likely took place on Christmas Day, 2008—just a few days before trial started.

Mr. McCurdy admits that he "knew that he had had the [Florida] conversation with Cheney in which a Christmas card is demanded . . . so McCurdy can save himself." *Def.'s Reply Mot. for New Trial* ¶ 2. Furthermore, according to

Mr. McCurdy, he "routinely recorded telephone calls to and from [his] residence," beginning in June 2008. *McCurdy Aff.* ¶ 2. Mr. McCurdy's contention that he did not remember taping a conversation with a key Government witness demanding drugs in return for favorable testimony only days before his trial began strains credibility. The Court concludes that Mr. McCurdy in fact knew of the Florida conversation at the time of trial.

### B. This Evidence was Available to Mr. McCurdy at the Time of His Trial

Mr. McCurdy's motion is based on a false premise: that to question Mr. Cheney about his efforts at extortion, Mr. McCurdy had to have the tape recording of the Florida conversation. This is simply incorrect and refuted by what occurred at trial. Mr. McCurdy had actual knowledge of his conversations with Mr. Cheney. He also had every right to cross-examine Mr. Cheney about: (1) whether he attempted to extort $100,000 worth of Oxycontin in exchange for exculpatory testimony; (2) whether Mr. Cheney admitted he said "no xmas card from ya, a xmas card to save yourself"; (3) what he meant by this odd statement; (4) whether "Christmas present" or "Christmas card" was a code word for drugs; (5) whether Mr. Cheney called Mr. McCurdy again when he arrived in Bangor; (6) whether, during this conversation, he discussed sending his "friend" over to pick up the drugs; (7) whether he called Mr. McCurdy a third time from Whiting to extort drugs from him; and (8) whether he demanded to know if they had "an agreement."

During voir dire, defense counsel questioned Mr. McCurdy about the substance of the Florida, Bangor, and Whiting calls. In the presence of the jury,

defense counsel cross-examined Mr. Cheney about the "agreement" discussed in the Bangor and Whiting recordings but chose not to question Mr. Cheney about the Florida conversation in front of the jury. However, AUSA Casey, after learning about the existence of the taped Maine conversations, pressed Mr. Cheney about the substance of his Maine and Florida phone calls to Mr. McCurdy.[17] *Tr. II* at 72:3 -

---

[17] On the Government's redirect of Mr. Cheney, the following exchange took place:

> Q. In addition to these two calls [made from Bangor and Whiting to Mr. McCurdy], have you previously spoken with Mr. McCurdy in the month or so leading up to your testimony here today?
>
> A. Yes, I've spoke with him for the past three years.
>
> Q. Again, focusing on within the past month or so?
>
> A. Yes, yes.
>
> Q. Have you had phone conversations with him?
>
> A. Correct.
>
> Q. About how many?
>
> A. Five, six.
>
> Q. Where were you when those phone calls were made?
>
> A. Florida.
>
> Q. Did you call him or did he call you?
>
> A. I -- I made the calls.
>
> Q. And before testifying here in court today, you hadn't told the Government about that either, have you?
>
> A. No.
>
> Q. During any of these calls, whether you made the calls when you were in Florida or whether you made the calls when you were in Maine, during any of these calls, have you and Mr. McCurdy discussed the substance of your testimony here today?
>
> A. No.

73:5.  It is manifestly serious for a Government witness to attempt to extort a defendant in exchange for favorable testimony.  But during trial, even though Mr. McCurdy knew about their conversations, his defense lawyer never asked these questions.  Instead of directly accusing Mr. Cheney of attempted extortion in the presence of the jury, Mr. Silverstein asked vague, roundabout questions and received vague, roundabout responses:

Q. You were looking from something from him, weren't you?

A. Looking for something?

Q. You were looking to acquire something from him, weren't you?

A. Acquire, what do you mean?

Q. Get --

A. Mm?

Q. Get something from him?

A. No.

Q. Really?  You didn't call him to ask if someone could stop by to pick something up?

---

Q. Have you and Mr. McCurdy discussed you altering your testimony here today for one reason or another?

A. No.

Q. Have you asked for anything in exchange for your testimony here today from Mr. McCurdy?

A. I haven't asked.

Q. Has Mr. McCurdy offered anything in exchange for your testimony here today?

A. For exchange, no.

*Tr. II* at 71:11-72:17.

A. He said he was going to give me a Christmas card for my daughter that he missed.

Q. I see. So you didn't look to get anything, but now you're telling us you were . . . getting [a] Christmas card for your daughter?

A. A Christmas card. I don't understand.

*Id.* at 47:22-48:13. After sidebar and Mr. Cheney's voir dire examination, Mr. Silverstein very briefly questioned Mr. Cheney about the Bangor and Whiting calls. *Id.* at 64:21-66:7. Mr. Cheney admitted they took place but insisted they were about a Christmas present for his daughter. *Id.* Mr. Silverstein never forcefully and directly asked Mr. Cheney—either before the Court or before the jury—anything about attempted extortion. It is difficult to know what the jury made of these questions and answers, but at trial the Court indicated its uncertainty about what Mr. McCurdy and Mr. Cheney were talking about. *Id.* at 57:7-15. Mr. Silverstein never cleared it up.

If Mr. McCurdy wished to press the extortion allegation, including the Florida conversation, he had to ask Mr. Cheney directly. If Mr. Silverstein had set out Mr. McCurdy's specific allegations in a series of specific questions to Mr. Cheney, Mr. Cheney would have been pushed to respond with more detail. Assuming the truth of Mr. McCurdy's allegations, Mr. Cheney may have admitted his attempted extortion if faced with a tough and specific cross-examination. If he did not, defense counsel could have represented to the Court that there was a

missing tape recording and sought a continuance to locate it.[18]  But Mr. Silverstein did not.

### ii. The Defendant Must Demonstrate Due Diligence

The second prong of the *Wright* test requires that the defendant demonstrate that his failure to bring the evidence forward at trial was not due to his own "lack of diligence."  625 F.2d at 1019; *see also Alicea*, 205 F.3d at 487 (affirming denial of motion for new trial where record "contained nothing that showed that the evidence on which [the defendant] relied . . . was not readily discoverable had he exercised due diligence").  The defendant must show he exercised "a degree of diligence commensurate with that which a reasonably prudent person would exercise in the conduct of important affairs."  *Maldonado-Rivera*, 489 F.3d at 69 (citing *United States v. Cimera*, 459 F.3d 452, 461-62 (3d Cir. 2006); *United States v. LaVallee*, 439 F.3d 670, 701 (10th Cir. 2006)).

Furthermore, the concept of due diligence extends not merely to whether the defendant was diligent in discovering the evidence but also to whether the defense made an effort to continue the trial in view of the missing evidence.  *See Wright*, 625 F.2d at 1019 (noting that "trial counsel made no motion for a continuance in order to attempt to locate" witness whose testimony allegedly constituted newly discovered evidence).  Information that defense counsel, for whatever reason,

---

[18] The Court rejects Mr. McCurdy's statement that "[i]t would have been impossible to ask the Court for a continuance . . . ."  *Def.'s Reply Mot. for New Trial* ¶ 3.  If a direct allegation had been made that a Government witness was attempting to extort the Defendant, the Court may well have continued the case to allow the parties to investigate and resolve the allegation.  But there was no direct allegation of extortion and no request for continuance.

"decides not to pursue . . . as part of his trial strategy" does not constitute "'newly discovered' [evidence] for purposes of Rule 33(a)." *United States v. Barnard*, 304 F. Supp. 2d 96, 101-02 (D. Me. 2004) (citing *Nardone v. United States*, 308 U.S. 338 (1939); *United States v. Mello*, 469 F.2d 356 (1st Cir. 1972); *United States v. Kampas*, 189 F. Supp. 720 (D.C. Pa. 1960)).

### A.   Mr. McCurdy Could Have Discovered this Evidence with Adequate Due Diligence

The Court is left without a good explanation as to why Mr. McCurdy lost the tape of the Florida conversation, the absence of which fails to sustain Mr. McCurdy's burden under *Wright*. *See* 625 F.2d at 1019. After all, it was Mr. McCurdy who taped these conversations just a few days before trial and presumably had access to those tapes up to the date of trial. Even if Mr. McCurdy is correct and the recording of the Florida conversation, when combined with the taped Maine calls, supports Mr. McCurdy's contention that a central witness for the Government attempted to extort him on the eve of trial, Mr. McCurdy now claims that the tape crucial to proving this highly charged allegation, which Mr. McCurdy himself possessed, suddenly went missing only days before trial.

Mr. McCurdy fails to adequately explain why he did not locate the tape of the Florida phone call. He says he spent the day before his trial listening to the tape recordings and that he discovered only the tapes of the Bangor and Whiting conversations later presented to the Court. *McCurdy Aff.* ¶ 10. Maybe so, but this statement does not explain why, with trial looming, he was not more diligent in

discovering the tape of a recent telephone conversation he now claims was crucial to his defense. Mr. McCurdy informs the Court that Amanda Prescott "found [the conversations] on a tape with several unrelated calls," *id.* ¶¶ 13, 14, but he offers no explanation as to why Ms. Prescott was able to locate these calls when he could not. It is unclear why there was any difficulty in locating the Florida recording where the record indicates this conversation took place on December 25, 2008 – only four days before trial began.

Moreover, , defense counsel did not mention the missing tape of the earlier conversation between Mr. Cheney and Mr. McCurdy and did not ask for a continuance to locate the missing tape. In fact, the first mention of a missing tape came with this motion more than two years after conviction.

### B. Mr. McCurdy Likely Did Not Seek Out this Evidence as a Matter of Trial Strategy

At this stage, Mr. McCurdy must convince the Court that the error he now asserts was not the result of a conscious trial strategy. *See, e.g., Nardone*, 308 U.S. 338; *United States v. Mello*, 469 F.2d 356; *Barnard*, 304 F. Supp. 2d 96. There are logical explanations for why the defense decided not to reveal before or at trial the true meaning of the "Christmas present" series of conversations.[19] First, there is no guarantee that without taking the stand, Mr. McCurdy would have been able to get his contentions about Mr. Cheney's attempted extortion admitted in evidence. Only two people participated in these conversations: Mr. Cheney and Mr. McCurdy.

---

[19] The Court acknowledges that it has inferred these strategic considerations from the record. Mr. Silverstein and Mr. McCurdy may have considered all of these matters, some, or none.

Even assuming he attempted to extort Mr. McCurdy, Mr. Cheney was unlikely to confess a crime on the stand and Mr. McCurdy never took the stand himself.

It is much more likely that if presented with a tape recording of the Florida call, Mr. Cheney would have admitted it was his voice on the tape because he did so (with some equivocation) for the Bangor and Whiting calls. *Tr. II* at 58:20-60:5. However, if, during voir dire on the Florida call, Mr. Cheney continued to deny attempting to extort Mr. McCurdy, it is difficult to understand how Mr. McCurdy could have properly presented his broader claim about the $100,000 extortion demand without testifying himself.[20] As earlier noted, there was no recording of the seminal conversation in which Mr. McCurdy alleges Mr. Cheney made the express demand for $100,000 of Oxycontin. The only tapes Mr. McCurdy claims to possess relevant to his most recent new trial motion are of the three Florida, Bangor and Whiting telephone calls. All three calls are wrapped in code words and indirection. While the Florida, Bangor, and Whiting calls exhibit some unusual behavior, it would have been difficult to argue, without more, that they support Mr. McCurdy's current accusation of extortion.

To make a direct accusation of attempted extortion based on the evidence of these two or three telephone recordings would have been an inherently risky trial

---

[20] On October 9, 2007, Mr. McCurdy pleaded guilty to possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1). *Minute Entry* (Docket # 57). He later moved to withdraw his guilty plea on May 1, 2008. *Def.'s Mot. to Withdraw Plea*. The Court granted the motion. *Order Granting Mot. to Withdraw Guilty Plea*. If Mr. McCurdy had testified, the Government may have sought to introduce evidence of his October 2007 guilty plea as a prior inconsistent statement or admission of a party opponent under Rule 801 of the Federal Rules of Evidence. *See* Fed. R. Evid. 801(d)(1)(A), (d)(2)(A). United States Supreme Court and First Circuit precedent allows the Government to use evidence of plea agreements in certain situations. *See United States v. Mezzanatto*, 513 U.S. 196, 210 (1995); *United States v. Newbert*, 504 F.3d 180, 181-82 (1st Cir. 2007) (citing *Mezzanatto*, 513 U.S. at 210).

strategy because the accusation is so serious and the evidence so equivocal. If presented to a jury, it could have seemed like a desperate tactic, throwing around accusations without solid proof. Moreover, even if Mr. McCurdy had presented the Florida call at trial, he would have been required to resort to an indirect accusation of incredibility, which is precisely what Mr. Silverstein argued at closing.[21] *Tr., Trial Proceedings, Volume III of III* at 38:11-22 (Docket # 211) (*Tr. III*).

If Mr. McCurdy were somehow able to put the full story before the jury, there would have been other problems. Evidence of attempted extortion would have introduced a new and highly volatile element into the trial. Until then, the case had been about whether a defendant previously convicted of an unnamed felony possessed a firearm. The Government's evidence consisted of a highly suspicious straw man sale on July 14, 2000, Mr. McCurdy's retrieval of the firearm in March 2001, the presence of the firearm in his attic in March 2006, and some additional incremental evidence. As the sole witness who placed the firearm in Mr. McCurdy's hands during the applicable statute of limitations, the defense had every reason to undercut Mr. Cheney's credibility but only so long as the tactic did not also implicate Mr. McCurdy himself.

---

[21] The relevant portion of Mr. Silverstein's argument reads:

> John Cheney who calls the defendant once he gets up here in Maine and says, do you have what I need? The defendant says, I don't have anything for you. John Cheney calls back and says, do we have an agreement, to which the defendant says, the truth doesn't change, Mr. Cheney.

> Cheney reluctantly admitted all this from the witness stand. Further admitted he lied to the Government agents, that's Mr. Casey, in their trial preparation session. This is the word that the Government would ask you to accept as proof beyond a reasonable doubt of my client's guilt.

*Tr. III* at 38:11-22.

Although the jury knew Mr. McCurdy was a felon and had possibly physically assaulted his girlfriend, there was no suggestion he was a drug addict or a person who had robbed pharmacies at gunpoint for drugs. If defense counsel had aggressively cross-examined Mr. Cheney on his attempted extortion, the natural question would have arisen as to why Mr. Cheney would demand that Mr. McCurdy produce $100,000 of Oxycontin unless he thought Mr. McCurdy could do so. At best, the jury would have had to puzzle out the implications of Mr. Cheney's demand. At worst, an explicit extortion accusation against Mr. Cheney might have opened up areas of damaging evidence against Mr. McCurdy that the jury knew nothing about.

Under *Old Chief v. United States*, 519 U.S. 172 (1997), the jurors did not know Mr. McCurdy had been convicted of four violent felonies, each involving the robbery of a pharmacy: two May 14, 1984 convictions and two June 1, 1984 convictions. The jury did not know the latter two convictions involved Mr. McCurdy's use of a firearm, and they did not know Mr. McCurdy had a significant history of drug abuse that began when he was thirteen years old and included abuse of oxycodone. In addition, the record does not reflect what Mr. Cheney actually knew about Mr. McCurdy's other activities during the years Mr. McCurdy and Ms. Sawtelle were friendly.

If Mr. Silverstein had aggressively cross-examined Mr. Cheney, this tactic could have backfired on the defense. Backed into a corner, Mr. Cheney may well have volunteered information about Mr. McCurdy's activities explaining why Mr. Cheney made him the target of prescriptive drug extortion. This potential might

explain why Mr. Silverstein was so cagey in questioning Mr. Cheney. Even if this evidence did not come out on cross-examination, if the defense opened the door, the Government would likely have been able to introduce some or all of it during its redirect examination of Mr. Cheney. *See United States v. Joost*, 133 F.3d 125, 128 (1st Cir. 1998) ("A party who opens a door cannot be heard to complain that the adverse party strolled through the doorway."). The net result may well have been that the jury had more reason to convict Mr. McCurdy.

What is apparent is that Mr. Silverstein decided to tread lightly with Mr. Cheney, to splatter him with just enough mud without dirtying Mr. McCurdy, and to argue during closing that Mr. Cheney was not to be believed. During his closing, Mr. Silverstein argued that Mr. Cheney was not credible by emphasizing Mr. Cheney's altercation with Mr. McCurdy the morning of March 27, 2006, his resentment of Mr. McCurdy for his treatment of his mother, Mr. Cheney's prior convictions (lying to an officer, theft, burglary, and forgery), and Mr. Cheney's odd Bangor and Whiting conversations with Mr. McCurdy. *Tr. III* 37:20-38:22. In light of the context, Mr. Silverstein's limited questions at trial were eminently reasonable.

The law requires more of a defendant seeking to overturn a jury verdict based on newly discovered evidence than Mr. McCurdy has presented here. The Court concludes that Mr. McCurdy has not sustained his burden of showing that the evidence of the Florida conversation could not have been located with the exercise of

due diligence and has failed to convince the Court that the error he now asserts was not the result of conscious trial strategy.

### iii.    The Evidence Must be Material

"Evidence that is cumulative or of marginal relevance ordinarily is insufficient to satisfy the third requirement" of the *Wright* test.  *Maldonado-Rivera*, 489 F.3d at 70 (citing *United States v. Gwathney*, 465 F.3d 1133, 1144-45 (10th Cir. 2006); *United States v. Natanel*, 938 F.2d 302, 314 (1st Cir. 1991)).   Furthermore, "newly discovered evidence which is merely impeaching normally cannot form the basis for a new trial."  *Barrett v. United States*, 965 F.2d 1184, 1195 (1st Cir. 1992); *see also Maldonado-Rivera*, 489 F.3d at 70; *United States v. Colón-Muñoz*, 318 F.3d 348, 361 (1st Cir. 2003).

### A.    This Evidence is Cumulative

First, the tape recordings of the Bangor and Whiting conversations were available at trial and not used by Mr. McCurdy.[22]   Although Mr. Silverstein played the Bangor and Whiting calls for the Court and questioned Mr. Cheney about them on voir dire outside the presence of the jury, he never played either recording to the jury.  Because the defense did not use the evidence it did have, the Court can only speculate as to what the defense would have done with the evidence it did not have. Moreover, as the Court has pointed out, the absence of the tape recording of the

---

[22] The Bangor recording contains Mr. Cheney's references to having "a boy swinging by" and a direct question from Mr. Cheney to Mr. McCurdy "u got what i need?" to which Mr. McCurdy replies "no." *Prescott Email*.  In the Whiting conversation, Mr. Cheney tells Mr. McCurdy he is close.  *Id*.  Mr. Cheney asks whether they have "an agreement or no" and says, "u know what i am saying."  *Id*. After Mr. McCurdy says the "truth doesnt change" and "u cant be playing both sides and the middle with the feds," Mr. Cheney responds that he is "not playing."  *Id*.  The conversation ends when Mr. Cheney hangs up.

Florida conversation did not prevent the defense from asking Mr. Cheney about his recollection of the Florida conversation, particularly on voir dire outside the jury's presence. The Court does not know how Mr. Cheney would have responded because the defense never posed the question.

What exactly does the Florida conversation add to the Bangor and Whiting conversations? Absent direct evidence of the $100,000 Oxycontin demand (which would have been of highly questionable admissibility on foundational grounds), Mr. Cheney's Delphic reference to "no xmas card from ya, a xmas card to save yourself" would have added to the confusion. *Prescott Email.* The force of Mr. McCurdy's current allegation—that the comment was part of Mr. Cheney's attempted shakedown—relies on Mr. McCurdy's revelation of the $100,000 demand and would not otherwise have been readily apparent. The rest of the Florida conversation is obscure—"ill swing by tomorrow," "whatever is going to happen," and "what we talked about before, everything all good?"—and does not add much to Mr. McCurdy's allegations. *Id.* Absent more context, the Court is not convinced that the Florida telephone call would have made any material difference at trial.

Mr. McCurdy now claims, in effect, that Mr. Cheney's more direct reference in the Florida call to "xmas card to save yourself" would have given him the ammunition to directly raise Mr. Cheney's attempted extortion at trial. The Court is not convinced. First, although the Florida call adds only vague, incremental weight to Mr. McCurdy's accusation, the defense did not set the table for admission by demonstrating that the tape would have been necessary to begin with. If Mr.

Cheney had been asked about the content of the conversation and denied it, that would be one thing, but there was no such attempt. The defense did not allege, through cross-examination or through offer of proof on the Bangor and Whiting recordings, that Mr. Cheney was attempting to extort drugs from Mr. McCurdy in exchange for favorable testimony.

The tapes that Mr. McCurdy produced were sufficient to raise questions about the meaning of "Christmas present" and, with Mr. McCurdy's own knowledge of previous conversations, Mr. Silverstein could have pressed Mr. Cheney on the true meaning of the phrase, could have played the tapes to the jury in light of Mr. Cheney's denial, could have asked Mr. Cheney about the earlier conversations to obtain his response, and could have asked for a continuance to obtain the tape of the earlier conversation. Yet he did none of these things. Without more, the Court concludes that the newly proffered telephone conversations are cumulative of the evidence presented to the jury.

### B.     This Evidence is Merely Impeaching

There is yet another reason why Mr. McCurdy fails the materiality prong of the *Wright* standard: the Florida recording is impeachment evidence that "does not bear directly on the defendant's guilt or innocence." *Barrett v. United States*, 965 F.2d 1184, 1195 (1st Cir. 1992) (citing extensive case law). Impeachment evidence is generally considered immaterial. *Id.* Here, the evidence did not go to whether Mr. McCurdy actually possessed a firearm but whether Mr. Cheney was being truthful about conversations he had with Mr. McCurdy about an entirely different

subject from which the jury could have made decisions about Mr. Cheney's overall credibility.

This factor is a closer call because impeachment evidence can be more significant "where the evidence is highly impeaching *or* when the witness' testimony is uncorroborated and essential to the conviction." *Conley v. United States*, 415 F.3d 183, 189 (1st Cir. 2005) (quoting *United States v. Martinez-Medina*, 279 F.3d 105, 126 (1st Cir. 2002)) (emphasis in *Conley*). To analyze this question, the Court turns to the fourth prong of the *Wright* test.

### iv. The Evidence Must Create a Probability of Acquittal upon Retrial

The fourth prong requires that the defendant show that his new evidence "will probably result in an acquittal upon retrial of the defendant." *Wright*, 625 F.2d at 1019. This means "the evidence must create an actual probability that an acquittal would have resulted if the evidence had been available." *Sepulveda*, 15 F.3d at 1220 (citing *Slade*, 980 F.2d at 29; *Wright*, 625 F.2d at 1019)); *see also Maldonado-Rivera*, 489 F.3d at 66 n.3 (quoting *Sepulveda*, 15 F.3d at 1220).

First, considering the way the defense treated the tape recorded calls it possessed, the Court cannot conclude that the incremental probative value of the Florida phone call would have changed the jury's verdict. As discussed, perhaps for reasons of trial strategy or evidentiary reasons, Mr. McCurdy seemed reluctant to bring the full weight of his extortion accusation to bear. He did not actively use either of the two recordings of the telephone conversations that he had and he did not levy the charge of attempted extortion at Mr. Cheney. Assuming that the

Florida call added an incremental degree of credibility to his claim of attempted extortion, Mr. McCurdy has no recording of the seminal conversation in which Mr. Cheney supposedly made his demand for $100,000 of Oxycontin. As the Court has already pointed out, without more context, the contents of the Florida call remain foggy.

Second, Mr. McCurdy did question Mr. Cheney about the Bangor and Whiting conversations and he did argue on closing that Mr. Cheney was not to be believed. However, the jury rendered a guilty verdict. The Court is not convinced that a jury would exculpate Mr. McCurdy based on the additional, non-contextual evidence of the Florida call, and cannot conclude that after hearing the contents of the Florida call, a jury would arrive at a different verdict.

Third, the Government presented evidence of Mr. McCurdy's possession of a firearm that did not depend upon Mr. Cheney's credibility. Trial testimony revealed that Mr. McCurdy went to Smitty's Gun Shop on July 14, 2000 with his then girlfriend, Janelle Hayward, and induced her to purchase a firearm for him. Mr. Smith (the owner of the gun shop) and Ms. Hayward described in detail the date and the circumstances of Ms. Hayward's straw purchase of the firearm. Ms. Hayward further testified that in March 2001, Mr. McCurdy came to her home and retrieved the firearm. The firearm Ms. Hayward bought for Mr. McCurdy on July 14, 2000 and that Mr. McCurdy retrieved in March 2001 was found by the police in Mr. McCurdy's attic on March 27, 2006.

Two final corroborating factors are the testimony of then Deputy Jonathan Rolfe, one of the investigating officers, and the positioning of the ratchet straps on the military harness. Following a 911 call, Deputy Rolfe responded to Mr. McCurdy's home on March 27, 2006 and found in Mr. McCurdy's attic a black firearms case, a military harness with .37 millimeter rounds, and eleven magazines with rounds inside. *Tr. I* at 126:1-127:5; 136:1-5. Deputy Rolfe brought the firearm case to the Sheriff's Office but was unable to open it because it was locked. *Id.* at 127:22-128:3. He pried the latch open and found a Colt AR-15 and the upper part of an M16 with a 203 flare launcher attached to it. *Id.* at 128:12-18. At closing, the Government argued that because Mr. Cheney was able to describe the configuration of the AR-15 and its flare launcher, he must have seen the firearm in that same configuration before Deputy Rolfe went into the attic and retrieved the firearm case, and that Mr. Cheney's ability to describe the configuration was consistent with his other testimony about Mr. McCurdy's recent possession of the firearm. *Tr. III* at 15:9-17:14.

The military harness is a shoulder harness that allows a person with a firearm like an AR-15 to carry magazines in side pouches. AUSA Casey argued at closing that the shoulder straps were adjusted to fit a person about Mr. McCurdy's size and not to fit Mr. Cheney, who was much taller and heavier. *Tr. III* 46:5-16 (describing Mr. Cheney as a six foot, six inch man weighing 250 pounds); *Gov't's Objection to Def.'s Mot. to Suppress* (Docket # 12) Attach. 1 at 1 (*Incident Report*)

(describing Mr. McCurdy as measuring five feet, five inches tall and weighing 150 pounds).

Even discounting some portion of Mr. Cheney's testimony based on his odd telephone comments, the Government's case would still likely have resulted in conviction based on Mr. McCurdy's use of a straw man to purchase the firearm in 2001, the alterations to the firearm that the Court discussed in its July 8, 2009 Order, Mr. McCurdy's retrieval of the firearm from Ms. Hayward for a bogus reason, the firearm's presence in Mr. McCurdy's attic, its configuration in the firearms case, the ratcheting of the shoulder harness, and Mr. Cheney's testimony, to the extent the jury believed it. Mr. McCurdy is correct that Mr. Cheney was the only witness who actually put the firearm in Mr. McCurdy's hands during the applicable statute of limitations period. But it is also true that Mr. Cheney's testimony was consistent with the other evidence of Mr. McCurdy's possession of the firearm.[23]

### 3. Conclusions on Mr. McCurdy's Motion for New Trial

In sum, the Court rejects Mr. McCurdy's contention that the Government suborned perjury, concludes that Mr. McCurdy has not demonstrated that the tape recording of the Florida call constitutes newly discovered evidence unavailable to him at the time of trial, and finds that evidence of the Florida call does not create "a sufficient probability that a jury would reach a verdict of acquittal." *Wright*, 625 F.2d at 1020. The Court also finds that an evidentiary hearing is unnecessary and

---

[23] The Court instructed the jury that the term possession referred to actual and constructive possession and sole and joint possession and defined each term. *Tr. III* 66:6-67:6.

would only be superfluous.  *See Connolly*, 504 F.3d at 219-20.  Therefore, the Court

denies Mr. McCurdy's motion for a new trial and his request for an evidentiary

hearing in support of the motion.

### B.    Motion for Discovery

#### 1.    Legal Standard

Rule 16(a)(1)(B) of the Federal Rules of Criminal Procedure provides, in

relevant part:

> Upon a defendant's request, the government must disclose to the
> defendant, and make available for inspection, copying, or
> photographing, all of the following:
>
> (i)  any relevant written or recorded statement by the defendant *if*:
>
> - the statement is within the government's possession,
>   custody, or control; and
>
> - the attorney for the government knows—or through due
>   diligence could know—that the statement exists[.]

FED. R. CRIM. P. 16(a)(1)(B)(i) (emphasis added).  Rule 16(a)(1)(E) provides in part:

> Upon a defendant's request, the government must permit the
> defendant to inspect and to copy or photograph books, papers,
> documents, data, photographs, tangible objects, buildings or places, or
> copies or portions of any of these items, if the item is *within the
> government's possession, custody, or control* and:
>
> (i)     the item is material to preparing the defense;
>
> (ii)    the government intends to use the item in its case-in-chief at
>         trial; or
>
> (iii)   the item was obtained from or belongs to the defendant.

FED. R. CRIM. P. 16(a)(1)(E)(i)-(iii) (emphasis added); *see also United States v.

Poulin*, 592 F. Supp. 2d 137, 141-42 (D. Me. 2008).  Especially relevant to this

dispute, "[t]he Government has no duty to produce . . . 'evidence outside of its control,' nor can the Court compel it to do so." *Poulin*, 592 F. Supp. 2d at 142 (citing *United States v. Hughes*, 211 F.3d 676, 688 (1st Cir. 2000) ("Because the government was never in control of the photographs, it is not responsible for any failure to produce them.")); *see also Bender*, 304 F.3d at 163 ("[T]he rigors of *Brady* usually do not attach to material outside the federal government's control." (quoting *Sepulveda*, 15 F.3d at 1179)).

### 2. Discussion

#### a. Phone Recordings

Mr. McCurdy moves for discovery of, among other items, copies of all telephone calls recorded by the Government between November 13, 2008 and December 31, 2008. The Government responds, unequivocally, that "[t]he alleged recordings were never made." *Gov't's Resp. to Mot. for Disc.* at 1.

To order the Government to produce a statement, the statement must first be "within the government's possession, custody, or control." FED. R. CRIM. P. 16(a)(1)(B)(i). In support of his motion, Mr. McCurdy claims a United States Probation Officer told him that the Government recorded his phone calls and used the information from those calls to aid in the examination of witnesses. *Def.'s Mot. for Disc.* at 3-4; *Def.'s Mot. for Produc.* Ex. 3 at 1-2 (*Letter to Paula Silsby, former U.S. Att'y for the Dist. of Me.* (Sept. 24, 2008)). The Government responds that whatever the Probation Officer may have said to Mr. McCurdy, the Probation Office

did not record his telephone calls while he was awaiting trial.[24] *Gov't's Resp. to Mot. for Disc.* at 1. The Court will not order discovery of statements that the Government says do not exist based on an unsubstantiated allegation that the Probation Office recorded Mr. McCurdy's phone calls. The Court denies Mr. McCurdy's request for discovery for all items related to the recorded calls – items A-D and part of item H[25] in the motion for discovery. *Def.'s Mot. for Disc.* at 2.

### b.    Title 18 U.S.C. § 2519 Reports

Title 18, section 2519 of the United States Code requires judges or designated government attorneys to issue reports relating to any § 2518 orders involving the interception of wire, oral, or electronic communications. *See* 18 U.S.C. §§ 2518-19. As there is no evidence that any court issued a § 2518 order in Mr. McCurdy's case, there is no evidence that a § 2519 report exists. Therefore, the Court denies Mr. McCurdy's Rule 16 motion for reports filed pursuant to 18 U.S.C. § 2519.

### c.    Court Orders Relating to Surveillance

Mr. McCurdy requests court orders relating to surveillance during his conditional release.[26] These documents are a matter of public record and are available through the Court's CM/ECF system. *Order Setting Conditions of Release*

---

[24] As the Court earlier noted, even if the Court accepts Mr. McCurdy's allegation about what Probation Officer Eggert told him, Officer Eggert may have used this technique to assure compliance with the bail conditions, expecting Mr. McCurdy would be less likely to violate his terms of release if he thought his calls were recorded.

[25] Mr. McCurdy's motion contains two headings "F." *Def.'s Mot. for Disc.* at 2. Here, the Court's use of "H" refers to the second item listed as "F" (the one following heading "G") that reads, "A description of all the materials resulting from the phone monitoring and any and all recorded statements of the Defendant obtained by way of the surveillance that are in any way related or material to the charged offense." *Id.* To the extent that item "H" moves for discovery of recorded statements, the Court denies that request under the reasoning of this subsection. As far as "H" relates to "materials resulting from phone monitoring," *infra* Part II.B.2.e addresses that issue.

[26] The request for court orders, listed as "E" in the Motion for Discovery, reads, "Any and all orders issued by any court authorizing electronic surveillance of the Defendant." *Id.*

(Docket # 10); *Amended Order Setting Conditions of Release* (Docket # 84); *Second Amended Order Setting Conditions of Release* (Docket # 153). As this material may be accessed without a court order, the Court denies Mr. McCurdy's request for orders relating to surveillance during his conditional release.

### d. Agreement with the United States Probation Office

Mr. McCurdy also requests:

[a] copy of the agreement between the United States Probation Office and McCurdy concerning the Home Monitoring System, which allowed for electronic surveillance of the Defendant, restricted him to one telephone line at his residence, and provided for 24 hour telephone monitoring of the Defendant to insure [sic] that he complied with his bail conditions.

*Def.'s Mot. for Disc.* at 2. Mr. McCurdy may obtain a copy of the agreement by contacting the United States Probation Office. If Mr. McCurdy encounters difficulties acquiring the agreement, he may petition the Court for an order at that time. As his request is premature, the Court denies the discovery request regarding any surveillance agreement between Mr. McCurdy and the Probation Office.

### e. Description of All Materials Relating to the Alleged Phone Monitoring

Mr. McCurdy also requests "[a] description of all the materials resulting from the [Probation Office's] phone monitoring" of his house. *Def.'s Mot. for Disc.* at 2. Rule 16 of the Federal Rules of Criminal Procedure governs discovery of such materials. *See* Fed. R. Crim. P. 16(a)(1)(E). The Rule requires, first and foremost, that the Government possess the requested documents. Fed. R. Crim. P. 16(a)(1)(E); *Poulin*, 592 F. Supp. 2d at 141-42.

Here, it appears there was no phone monitoring of the Defendant by the Probation Office or any other governmental entity. The Government states, and Mr. McCurdy offers no credible evidence to the contrary, that the recordings he seeks do not exist. Mr. McCurdy's request for a description of materials relating to phone monitoring is also denied.

### C.     Motion for Production of Documents under Jencks Act

#### 1.     Legal Standard

"The Jencks Act, 18 U.S.C. § 3500, in concert with [Federal Rule of Criminal Procedure] 26.2, controls the production of certain witness statements in the government's possession." *United States v. Marrero-Ortiz*, 160 F.3d 768, 775 (1st Cir. 1998). Section § 3500(b) of the Jencks Act states:

> After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement . . . of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified.

18 U.S.C. § 3500(b). Rule 26.2 also requires the court, "on motion of a party who did not call the witness," to order the production of "any statement of the witness that is in [the nonmoving party's] possession and that relates to the subject matter of the witness's testimony." FED. R. CRIM. P. 26.2(a). For purposes of this Rule, "statement" is defined to include "the witness's statement to a grand jury . . . or a transcription of such a statement." FED. R. CRIM. P. 26.2(f)(3).

## 2. Discussion

Mr. McCurdy asks for an order requiring the Government to produce documents relating to the grand jury proceedings resulting in his indictment. Specifically, he demands a list of grand jury witnesses, Mr. Cheney's June 7, 2006 grand jury testimony, and "[a]ny statement by any witness used by the prosecution and presented to the grand jury in conjunction with [Mr. Cheney's] appearance before the grand jury or in lieu of that witness's appearance before the grand jury." *Def.'s Mot. for Produc.* at 1-2.

The Government initially responded that neither Rule 26.2 nor the Jencks Act applied because they concern production of documents at trial and Mr. McCurdy "has already had his trial." *Gov't's Resp. to Mot. for Produc.* at 1 (Docket # 231). The Government also argued that, in any event, it had already supplied Mr. Silverstein with "all the discovery and Jencks Act Materials well in advance of trial." *Id.*

Mr. McCurdy replied on May 16, 2011, denying that his attorney ever received a transcript of Mr. Cheney's grand jury testimony and attaching a copy of an email from Attorney Silverstein, indicating that he had "no evidence that John Cheney appeared and testified before the Grand Jury." *Def.'s Reply to Gov't's Resp. to Mot. for Produc. of Docs. under Jencks' Act* (Docket # 236) Attach. 1 (Email from Jeffrey Silverstein to Mark McCurdy (Apr. 12, 2011)). The Government further responded on June 17, 2011, enclosing a copy of an email dated June 10, 2011 from Mr. Silverstein, confirming that he had been mistaken, that he had a copy of Mr.

Cheney's grand jury testimony, and that he had sent a copy of that testimony to Mr. McCurdy.[27] *Silverstein Email.*

Still unclear about what the Government said it disclosed and what Mr. McCurdy acknowledged he received, the Court ordered the Government to supplement its response. *Order for Supp. Resp.* In its supplementary response, filed August 12, 2011, the Government states that "in advance of trial, it provided defense counsel with all discovery and Jencks Act materials in this case" and confirms that defense counsel in fact received Jencks Act materials, including a transcript of Mr. Cheney's grand jury testimony. *Gov't's Supp. Resp.* at 1-2, Attachs. 1-4 (pretrial discovery letters to defense counsel indicating transmission of Jencks Act and discovery materials).

The Court is fully satisfied that the Government complied with the Jencks Act and Federal Rule of Criminal Procedure 26.2 and that Mr. McCurdy now has, or has access to, all of the documents he seeks through his motion to produce. The Court, therefore, denies Mr. McCurdy's Motion for Production of Documents.

## III. CONCLUSION

The Court DENIES Mr. McCurdy's April 8, 2011 *Pro Se* Motion for New Trial (Docket # 224). The Court also DENIES his April 22, 2011 *Pro Se* Motion for Discovery of Materials Related to Electronic Surveillance of Defendant (Docket #

---

[27] This email reads:

> Joel – Terry and I spoke about this [today] and realized that she never had my trial notebook amongst the materials she searched. In any event, once I reviewed my trial notebook I found Cheny's [sic] GJ testimony so have sent Mark a copy direct. Sorry for the confusion.

*Silverstein Email.*

227) and *Pro Se* Motion for Production of Documents under Jencks Act (Docket #

228).

      SO ORDERED.

                   /s/ John A. Woodcock, Jr.
                   JOHN A. WOODCOCK, JR.
                   CHIEF UNITED STATES DISTRICT JUDGE

Dated this 9th day of November, 2011